612 A.2d 932

STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, PLAINTIFF–RESPONDENT, AND THE CITY OF NEWARK, PLAINTIFF, v. SIGNO TRADING INTERNATIONAL, INC., A CORPORATION; SCI EQUIPMENT AND TECHNOLOGY, INC., A CORPORATION; STORAGE INNOVATIONS, INC., A CORPORATION; VISTA INTERNATIONAL, A CORPORATION; ATLANTIC COAST ENVIRONMENTAL, INC., A CORPORATION; RESOURCE TECHNOLOGY SERVICES, INC., A

CORPORATION; JACK COLBERT, AN INDIVIDUAL; CHARLES COLBERT, AN INDIVIDUAL; ROBERT MCKENNA, AN INDIVIDUAL; JOHN M. SPEAK, JR., AN INDIVIDUAL; EASTERN DISPOSAL, INC., A CORPORATION; AND EASTERN WASTE INDUSTRIES, INC., A CORPORATION, DEFENDANTS, AND MORTON SPRINGER & CO., INC., A CORPORATION, DEFENDANT AND THIRD–PARTY PLAINTIFF–APPELLANT, v. SCOVILL, INC., A CORPORATION; THIRD–PARTY DEFENDANT, AND FEDERAL INSURANCE COMPANY, A CORPORATION, THIRD–PARTY DEFENDANT–RESPONDENT.

Argued October 23, 1990—Reargued October 21, 1991.
Decided September 23, 1992.

*Clyde A. Szuch* argued the cause for appellant (*Pitney, Hardin, Kipp & Szuch,* attorneys; *Mr. Szuch, Robert G. Rose, Donald W. Kiel, Ellen M. Boyle,* and *David H. Harris,* on the briefs).

*Rachel Horowitz,* Deputy Attorney General, argued the cause for respondent State of New Jersey, Department of Environmental Protection (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Michael R. Clancy,* Assistant Attorney General, of counsel).

*William J. Brennan, III,* argued the cause for respondent Federal Insurance Co., a corporation, (*Smith, Stratton, Wise, Heher & Brennan,* attorneys; *Mr. Brennan* and *Wendy L. Mager,* of counsel; *Mr. Brennan, Ms. Mager,* and *Lillian E. Brown,* on the briefs).

*William B. McGuire* submitted a brief on behalf of *amicus curiae,* Insurance Environmental Litigation Association (*Tompkins, McGuire & Wachenfeld,* attorneys).

The opinion of the Court was delivered by

CLIFFORD, J.

The Appellate Division held that the "owned property" exclusion in the defendant property-owner's liability insurance policy relieved the third-party-defendant insurance carrier of any obligation to indemnify or defend its insured for its potential liability to the Department of Environmental Protection (DEP)

for the cost of cleanup of toxic substances resulting from a fire on the insured's property. *State, Dep't of Envtl. Protection v. Signo Trading Int'l, Inc.*, 235 *N.J.Super.* 321, 562 *A.*2d 251 (1989) (*Signo Trading*). We granted certification, 118 *N.J.* 227, 570 *A.*2d 980 (1989), to review that determination, and now affirm.

## I

In April 1983 defendant third-party plaintiff, Morton Springer & Co., owned a warehouse at 140 Thomas Street, Newark. Springer leased space to various tenants, including defendant Signo Trading International, Inc. On April 11th a fire occurred at the warehouse. After the Newark Fire Department had extinguished the fire, Springer hired a contractor to contain wastewater that had accumulated in trenches along the building perimeter. The contractor secured the wastewater in twenty-seven drums, after which DEP ordered Signo to clean up the debris from the floor on which the fire had occurred. By May 3rd the fire-damaged material had been removed from the property pursuant to a hazardous-waste manifest.

Because the fire had revealed the presence of hazardous materials, DEP's representative surveyed the premises to determine the contents of the warehouse. He discovered, in addition to chemicals and hazardous waste, leaking drums and other containers piled in a precarious manner, a non-operational sprinkler system, exposed wiring, a lack of fire extinguishers, and inadequate building security. DEP therefore directed that the premises be cleaned up and the offending materials removed. However, the pace of compliance was so slow that DEP resorted to the filing of a complaint in the Chancery Division in July 1983 to obtain judicial enforcement of the cleanup.

Because the owner and tenants failed to comply with a court order to decontaminate the property under DEP supervision, the trial court, in July 1984, ordered DEP to take exclusive possession and control of the warehouse and to clean up the

property with the use of public funds. Acting pursuant to the authority of the Spill Compensation and Control Act, *N.J.S.A.* 58:10–23.11 to –23.11z (Spill Act), DEP conducted the cleanup, at a cost of about $3.6 million.

During the cleanup process Springer filed a third-party complaint against Federal Insurance Co. seeking defense and indemnification in respect of DEP's claims. Federal had issued to Springer a primary comprehensive general liability (CGL) policy and an umbrella policy, both of which were in effect on the date of the fire. The CGL policy, which provided coverage for liability of up to $500,000 per occurrence, contained the following pertinent provision:

> The company will pay on behalf of the insured all sums which the insured shall become obligated to pay as damages by reason of liability *to which this insurance applies,* imposed by law or assumed by the insured under any written contract, for bodily injury, *property damage* or personal injury caused by an occurrence and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury, property damage or personal injury, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient. (Emphases added.)

The policy defined "property damage" as

> 1. physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or
>
> 2. loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

An "occurrence" is defined in the policy as

> an event, including continuous or repeated exposure to conditions, which results in * * * property damage * * *.

Excluded from the policy were coverage for "bodily injury or property damage arising out of an event, the result of which was expected or intended from the standpoint of the insured," and, significantly for this appeal, for property damage to "property owned * * * by the insured."

The umbrella policy contained similar provisions and exclusions.

In June 1985 Springer moved for summary judgment on the carrier's duty to defend, and Federal cross-moved for summary judgment. The trial court denied Springer's motion and granted Federal's, concluding in part as follows:

An occurrence in the policy is defined in such a way that basically it comes down to damage inflicted upon the person or properties of people other than the insured. That's essentially what it comes down to.

In our present case we simply do not have any damage inflicted upon a third party or the property of third parties.

\*       \*       \*       \*       \*       \*       \*       \*

[A]lthough the risk of damage to life and property of third parties was present and was a major concern in ordering this cleanup, there was no occurrence of any such damage to property or injury or death inflicted upon third parties. There simply was not an insured event occurring within the meaning of the policy.

\*       \*       \*       \*       \*       \*       \*       \*

[A]lthough there is much to be said for reading insurance policies liberally to give coverage to people who need it and might have some reasonable expectation that coverage exists, there is in the long run not much to be said for simply turning policies inside out and standing them on their heads and making them do jobs that they were not designed to do.

This kind of insurance policy was not designed to pay for preventing environmental damage work in the absence of any actual injury inflicted upon third parties or their property, and to simply take this policy and rework it or recast it because right now we could use this $500,000 would not just be unfair and inappropriate so far as this insurer is concerned, but it really amounts to half-baked social engineering that I think we shouldn't engage in. These policies really aren't designed to cover this kind of a situation, and they should not on a casual *ad hoc* basis be violently torn asunder in order to serve some make-way social policy. Just doesn't make sense.

Thereafter, in March 1988, Springer moved to vacate the trial court's order granting summary judgment to Federal and for summary judgment on Springer's third-party complaint, relying on two Appellate Division decisions handed down after the trial court's earlier ruling: *Broadwell Realty Services, Inc. v. Fidelity & Casualty Co.*, 218 *N.J.Super.* 516, 528 *A.*2d 76 (1987), and *CPS Chemical Co. v. Continental Insurance Co.*, 222 *N.J.Super.* 175, 536 *A.*2d 311 (1988). Federal resisted the motion on the basis that the cited cases were readily distinguishable in that they both involved continuing and ongoing damage to

property of third persons. The trial court readily grasped the factual distinction:

> It has never been proved before me, and indeed I don't think it's been alleged, in any way supported by significant evidence, that, in fact, there was migration of the chemical pollutants off the Morton Springer property onto any adjacent properties or actually into any of the waters of the state.

However, the court nevertheless read *Broadwell* to mandate coverage for avoidance costs, stating:

> My view was and is that that is not what these policies are designed to do. But my view also is that the Appellate Division has ruled in this reported case [(*Broadwell*)] that this policy does cover that kind of loss.
>
> I am obliged as a trial judge to follow the legal rulings of the Appellate Division even though I do not agree with them. And it seems to me that if this defendant insurance company and others wish relief, they'll have to get it either from the Appellate Division or from the Supreme Court.

From the consequent entry of judgment in favor of Springer the carrier appealed to the Appellate Division. That court reversed and entered judgment for Federal.

## II

In this, our first excursion into the thicket of environmental-pollution coverage, we are struck by the lack of uniformity in decisions regarding the applicability of the owned-property exclusion to the costs of cleanup. See Kenneth Abraham, *Environmental Liability and the Limits of Insurance*, 88 *Colum.L.Rev.* 942, 966–70 (1988). Understandably, the treatment that our Appellate Division has given the complicated question of insurance law in this area may be viewed as somewhat uneven. See, in addition to the Appellate Division decision in this case, the following: *Broadwell, supra,* 218 *N.J.Super.* 516, 528 *A.2d* 76; *CPS Chemical, supra,* 222 *N.J.Super.* 175, 536 *A.2d* 311; *Summit Associates Inc. v. Liberty Mutual Fire Insurance Co.,* 229 *N.J.Super.* 56, 550 *A.2d* 1235 (1988); and *Diamond Shamrock Chemicals Co. v. Aetna Casualty & Surety Co.,* 231 *N.J.Super.* 1, 554 *A.2d* 1342 (1989).

*Broadwell, supra,* involved the leakage of a hazardous substance onto adjacent property from underground storage tanks

on Broadwell's land. DEP directed Broadwell to clean up the area and prevent future harm. The issue in the case was whether Broadwell's liability policy, which is almost identical to the policies in this case, covered such cleanup costs. The court held that "the costs of preventive measures taken by Broadwell on its own property in response to the DEP directive which were designed to abate the continued flow of contaminants on to adjacent lands are recoverable under the policy." 218 *N.J.Super.* at 525, 528 *A.*2d 76. Having found "damages," the court then considered whether the "owned property" exclusion precluded recovery due to the fact that the cleanup costs had been occasioned by work on the insured's own land. The court rejected that exclusion, stating:

> We are satisfied that Fidelity would have been obliged to indemnify Broadwell for the costs of the interceptor trenches and the observation/recovery pumping wells had they been installed on adjacent properties in order to prevent further loss to third parties. *It would be folly to argue, under such circumstances, that the insured would be required to delay taking preventive measures, thereby permitting the accumulation of mountainous claims at the expense of the insurance carrier.* Stated another way, the policy does not require the parties to calmly await *further* catastrophe. Abatement measures designed to prevent the *continued* destruction of adjacent property are plainly compensable under the policy.

[*Id.* at 526, 528 *A.*2d 76 (emphases added).]

*CPS Chemical, supra,* involved a similar factual situation. CPS was found legally obligated under the Spill Act and the Water Pollution Control Act to pay the cost of cleaning up contamination from its plant. The toxins released from the plant had completely contaminated a nearby watershed. As in *Broadwell,* the Appellate Division held that

> monetary amounts awarded to the DEP for the purpose of implementing measures designed to *abate the continued migration of hazardous wastes into the Prickett's Brook and the Runyon well field in order to restore the acreage and the water to their natural condition prior to the unlawful discharge* constitute damages subject to the carrier's obligation of indemnification.

[222 *N.J.Super.* at 182, 536 *A.*2d 311 (emphasis added).]

In *Summit Associates, supra,* Summit Associates attempted to seek indemnification from its insurance company for costs associated with a DEP-mandated clean up. Summit Associates argued that *Broadwell* precluded application of the owned-property exclusion because its clean up had sought to prevent damage to the environment in general. The carrier contended that *Broadwell* excludes coverage because the facts revealed no third-party property damage. In remanding, the Appellate Division ordered the trial court to determine whether the hazard had damaged or had threatened damage to third-party property. If no such harm or threat existed, the inquiry was to end. On the other hand, if the trial court found harm or threat of harm, it was then to apply the traditional principles of insurance-contract interpretation set out in *Broadwell,* including whether application or non-application of the owned-property exclusion would best carry out the reasonable expectations of the parties.

Thus, *Summit Associates* is the first case to hint that a mere threat to third-party property *might* result in coverage for clean-up costs. The opinion requires that even if such a threat be found, the trial court still must examine the parties' expectations concerning the policy.

Finally, in *Diamond Shamrock, supra,* an insured sought indemnification for the costs of a dioxin clean up on its premises. The court's analysis makes clear that *Broadwell* and *CPS* did not provide for coverage in the absence of third-party property damage. The court noted that *Summit Associates* was the first case to raise the possibility that threatened property damage might fall within the policy's provisions, but only after a showing that the parties had intended such coverage. The case also raises the possibility that a court might find that the State's interest in its air and land might qualify as third-party property damage. The Appellate Division declined to decide that last question, stating that such a decision "impli-

cates highly significant policy considerations, and for this reason, [is] best decided on a full record developed at trial." 231 *N.J.Super.* at 15, 554 *A.*2d 1342. As it did in *Summit Associates*, the court remanded the matter to the trial court for a determination of whether the dioxin contamination had posed an imminent threat, and if so, then to determine, using traditional contract interpretation, whether the parties had intended coverage for threatened harm.

Returning now to this case, the Appellate Division pointed out that in both *Broadwell* and *CPS* pollutants had escaped from the insured's property and had caused injury to the property of third parties. 235 *N.J.Super.* at 335, 562 *A.*2d 251. That circumstance, according to the court below, served to distinguish this case, in which no off-site migration of contaminants had been proven. *Ibid.* The court then turned to *Summit, supra,* 229 *N.J.Super.* 56, 550 *A.*2d 1235, and acknowledged that under that decision,

> the "owned property" exclusion of a [CGL] policy does not bar coverage for costs associated with the clean-up of an insured's property, despite the absence of third-party damage, if "the threatened damage of third-party property was immediate and imminent" and if "non-application of the owned property exclusion would best carry out the reasonable expectations of the parties."
>
> [235 *N.J.Super.* at 335, 562 *A.*2d 251 (quoting *Summit, supra,* 229 *N.J.Super.* at 64–66, 550 *A.*2d 1235).]

Because "the threat of off-site contamination had not been shown to be either 'immediate' or 'imminent,'" *ibid.*, "the threatened harm to third parties was, at best, 'undefined and speculative' and, consequently, excluded from coverage." *Id.* at 335–36, 562 *A.*2d 251 (quoting *Summit, supra,* 229 *N.J.Super.* at 66, 550 *A.*2d 1235).

The Appellate Division's treatment of the case, thorough and instructive in so many respects, unfortunately founders on an unwarranted assumption of fact, despite which the court reaches the right result. The finding by that court that the threat of off-site contamination from the Springer fire had not been shown to be either "immediate" or "imminent" was quite simply incorrect. The trial court, after months, even years, of

exposure to the case, made a specific finding of fact that potential damages to adjacent properties were imminent. There was more than sufficient evidence to support that conclusion, wherefore reviewing courts are bound by it. *See Rova Farms Resort v. Investors Ins. Co. of Am.*, 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974) ("Findings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence."); *Borough of Glassboro v. Gloucester County Bd. of Chosen Freeholders*, 199 *N.J.Super.* 91, 95, 488 *A.*2d 562 (App.Div.), *aff'd*, 100 *N.J.* 134, 495 *A.*2d 49, *cert. denied*, 474 *U.S.* 1008, 106 *S.Ct.* 532, 88 *L.Ed.*2d 464 (1985).

The trial court's finding of "imminent danger" of migration of the hazardous substances from the insured's property is a significant one. If the pollution on the insured's property did threaten injury to the property of a third party, the trial court, according to *Summit*, "must then apply the traditional principles of contract interpretation [that the Appellate Division] reaffirmed in *Broadwell* including whether application or non-application of the owned property exclusion would best carry out the reasonable expectations of the parties." 229 *N.J.Super.* at 64, 550 *A.*2d 1235. As explained in *Diamond Shamrock*, "[p]resumably even if there was threatened injury to the property of a third party, the insurer would be liable in *Summit* only if, applying those principles, the phrase 'property damage * * * caused by an occurrence' in the insuring agreement is construed to include 'threatened damage.'" 231 *N.J.Super.* at 14, 554 *A.*2d 1342.

■ Although *Summit* suggests that those traditional contract-interpretation principles include "whether application or non-application of the owned property exclusion would best carry out the reasonable expectations of the parties," 229 *N.J.Super.* at 64, 550 *A.*2d 1235, courts should resort to the doctrine of reasonable expectations only when "the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." *Weedo v. Stone–E–*

*Brick, Inc.*, 81 *N.J.* 233, 246–47, 405 *A.*2d 788 (1979). "When the terms of an insurance contract are clear, [as in this case,] it is the function of a court to enforce it as written and not to make a better contract for either of the parties." *Kampf v. Franklin Life Ins. Co.*, 33 *N.J.* 36, 43, 161 *A.*2d 717 (1960).

Here, although Springer undoubtedly suffered physical damage to its own property, there is no evidence whatsoever in the record before us that any third party suffered a "physical injury to or destruction of tangible property," nor is there evidence of a "loss of use" of tangible property owned by an entity other than the insured. Although the trial court did find a *threat* of harm to the property of a third party, it specifically found "no third party damage within the meaning of this policy or any of its concepts." 235 *N.J.Super.* at 327, 562 *A.*2d 251. The policy's definition of property damage does not encompass "threatened harm" even if that threat is "imminent" and "immediate." Thus, under its clear terms, the policy does not cover the costs of cleanup performed by or on behalf of an insured on its own property when those costs are incurred to alleviate damage to the insured's own property and not to the property of a third party.

As the court stated in *Diamond Shamrock*, "There is no novelty to the proposition that in a conventional tort action, once some present injury has been proved, the plaintiff's damages may include the cost of measures intended to prevent future injury." 231 *N.J.Super.* at 12, 554 *A.*2d 1342. Thus, "[i]n both *Broadwell* and *CPS* [the Appellate Division] held that the insured was entitled to be indemnified for, among other things, sums expended on measures to prevent further, imminently impending[ ] injury to property owned by someone other than the insured," *id.* 231 *N.J.Super.* at 11–12, 554 *A.*2d 1342, despite the fact that the plain language of the policy did not allow for such recovery. However, as the court pointed out in *CPS*, "the obligation of the insurers is limited to indemnifying [the insured] for the monetary amounts awarded to the DEP

for the latter's use in attempting to eradicate the effects of the *present or past* pollution for which the insured has been adjudged liable." 222 *N.J.Super.* at 188, 536 *A.*2d 311 (emphasis added). The insurer's obligation does not extend to "prospective monetary damages for some undefined and speculative future loss." *Id.* at 187, 536 *A.*2d 311.

In this case, as in *Summit,* no present or past injury to the property of a third party was proven. Thus, in both this case and *Summit* the Appellate Division erred to the extent that it determined that an insured may recover the cost of measures intended to prevent future injury, even in the absence of a present or past injury, if the threat of such injury appears to be "imminent" or "immediate." See 235 *N.J.Super.* at 335–36, 562 *A.*2d 251; *Summit, supra,* 229 *N.J.Super.* at 66, 550 *A.*2d 1235. By the plain language of the CGL policy the cost of future damage is not covered, and this case does not fall within the narrow exception allowing recovery for the cost of measures intended to prevent imminent or immediate future damage when a present injury has already been demonstrated. *See Western World Ins. Co. v. Dana,* 765 *F.Supp.* 1011 (E.D.Cal. 1991) (giving effect to owned-property exclusion in circumstances similar to those here).

Our dissenting colleagues' reliance, *post* at 80–81, 612 A.2d at 947, on *Intel Corporation v. Hartford Accident & Indemnity Company,* 952 *F.*2d 1551 (9th Cir.1991), is misplaced. The *Intel* court refused to permit the carrier to escape coverage under the "owned property" exclusion for any expenses that had been incurred "to remedy *existing damage to third-party property* * * * from contaminants introduced by Intel," 952 *F.*2d at 1566 (emphasis added), but did give effect to the exclusion for whatever expenses had been incurred "only to remedy damage to property Intel itself controlled." *Ibid.* Under California law, damage to groundwater, such as had occurred in *Intel,* is viewed not as damage to property of the occupier of the land but rather as damage to third parties. *Id.*

at 1565. Therefore, unlike the situation in the case before us, *Intel* clearly involved damage to property of third persons, wherefore the "owned property" exclusion did not apply to the expenses incurred in remedying that damage.

Springer argues that coverage should be provided even though damage is confined to its property, because that damage constitutes damage to the State's *parens patriae* interest in the air, land, and water. The argument finds support in *State v. New York Central Mutual Fire Insurance Co.*, 147 *A.D.*2d 77, 542 *N.Y.S.*2d 402 (App.Div.1989) (*New York Central Mutual*), in which the court held that an oil spill had caused damage to property of a third party because the oil had "entered the groundwater, or at the very least [had] threatened to [do so]," *id.* 542 *N.Y.S.*2d at 403, and, under New York law, groundwater is a natural resource protected by the State as trustee for its people.

Whether or not that case was correctly decided, its reasoning is not applicable here. First, the trial court in this case found no evidence that "there was migration of the chemical pollutants off the Morton Springer property * * * into any of the waters of the state." *Signo Trading, supra*, 235 *N.J.Super.* at 328–29, 562 *A.*2d 251. Second, to the extent that the court in *New York Central Mutual* invoked coverage because of a "threat" that the oil would enter the groundwater, its reasoning is unpersuasive. As set forth above, *supra* at 56, 612 *A.*2d at 934, the CGL policy at issue indemnifies the insured only for damage to the property of a third party and not for the threat of such damage.

Springer and DEP also present several policy arguments supporting a finding of coverage. Foremost among those is the argument that a finding of non-coverage "would create the situation in which an insured would have an incentive to permit hazardous substances that have discharged on [its] property to migrate off-site in order to collect from its insurer for the costs of cleanup." *Signo Trading, supra,* 235 *N.J.Super.* at 330, 562

*A.*2d 251.. Federal responds that "such recovery would be barred under several policy provisions that exclude from coverage damages that were 'expected or intended from the standpoint of the insured.'" *Ibid.* Moreover, even if a discharge of hazardous substances has caused actual damage to property of a third party without contrivance by the insured, the owned-property exclusion would bar coverage of response expenses incurred not to prevent off-site contamination but to cover the cost of cleanup of the insured's property. *Broadwell,* 218 *N.J.Super.* at 528, 528 *A.*2d 76. To the extent clean-up expenses serve both objectives, apportionment would be required.

■ Regardless, public policy considerations alone are not sufficient to permit a finding of coverage in an insurance contract when its plain language cannot fairly be read otherwise to provide that coverage. See *Signo Trading, supra,* 235 *N.J.Super.* at 332–33, 562 *A.*2d 251 ("Notwithstanding the 'highly significant policy considerations' raised by the issues under review, there exists no legal principle that would permit this court to ignore or circumvent the clear language of the insurance contracts." (citation and footnote omitted)); *Broadwell, supra,* 218 *N.J.Super.* at 523, 528 *A.*2d 76 (recognizing "competing public policies" but stating that "[o]ur role is merely to interpret the language of the insurance contract").

### III

We need not long tarry on the dissent's informative discussion of whether environmental-response costs are covered damages under a CGL policy. Significantly, no party addressed that question at any stage of these proceedings until after the first oral argument in this Court, and then only in response to an inquiry generated by some members of the Court. At no point in this litigation has Federal sought to avoid coverage on the basis that response costs are not damages within the meaning of the policies. Rather, it argues, and we agree, that the effect of the owned-property exclusion is to make the

policies' coverage inapplicable in the absence of property damage to third persons, as defined in the policies. No definition of "damages" can surmount that exclusion nor can it somehow enlarge or expand the policies' carefully-framed coverage provisions.

We do not mean to suggest that the dissent's analysis of what constitutes "damages" is incorrect. However, because our interpretation of the owned-property exclusion results in an absence of coverage—that is, the insurance does *not* apply—we are content to leave for another day a definitive resolution of the "damages" question.

## IV

Judgment affirmed.

O'HERN, J., dissenting.

The issues in this appeal are whether (1) the "owned-property" exclusion or (2) the definition of "damages" in a Comprehensive General Liability (CGL) policy precludes coverage of environmental-cleanup costs assessed against a property owner under the New Jersey Spill Compensation and Control Act, *N.J.S.A.* 58:10–23.11 to –23.11z (Spill Act).

New Jersey has always given an everyday, common-sense interpretation to the terms of insurance policies. *Allen v. Metropolitan Life Ins. Co.*, 44 *N.J.* 294, 208 *A*.2d 638 (1965). This policy's everyday, common-sense meaning is that if an insured has to pay money to the government because of an environmental spill, it has been required to pay "damages," and those damages are not being paid for its benefit but to remedy a wrong to the tangible property of others.

In nearly all American jurisdictions in which the state's rules of insurance-contract interpretation require such contracts to be construed within the common usage of terms, courts have construed the word "damages" under a CGL policy to include environmental-response costs. *See Independent Petrochemi-*

*cal Corp. v. Aetna Casualty & Sur. Co.*, 944 *F*.2d 940, 946 & n. 7 (D.C.Cir.1991), *cert. denied*, —— *U.S.* ——, 112 *S.Ct.* 1777, 118 *L.Ed.*2d 435 (1992).

I would hold that based on the reasonable expectations arising from the " 'words of common speech' " in the policy, *Meier v. New Jersey Life Ins. Co.*, 101 *N.J.* 597, 612, 503 *A*.2d 862 (1986) (quoting *Gaunt v. John Hancock Mut. Life Ins. Co.*, 160 *F*.2d 599, 602 (2d Cir.), *cert. denied*, 331 *U.S.* 849, 67 *S.Ct.* 1736, 91 *L.Ed.* 1858 (1947)), an insured would conclude that it has indeed suffered legal "damages" when a governmental order requires it to pay money to remedy the imminent pollution of public air or water resources. I believe that an insured would also conclude that the policy's "owned-property" exclusion is intended to preclude first-party coverage to the insured itself (as would be the case if the insured sought reimbursement for a damaged item of its own property, such as a computer-storage area of a building), but not to a third-party claim asserted by the State of New Jersey through the provisions of its Spill Act.

I

For purposes of this appeal, I accept the version of the facts and procedural history that is set forth in the insurer's briefs in this Court. On April 11, 1983, a disastrous chemical fire occurred at a Newark warehouse owned by Morton Springer & Co. (Springer) and occupied, in part, by Signo Trading International, Inc. (Signo).

After the Newark Fire Department had extinguished the fire, polluted wastewater and other fire-damaged materials had to be removed from the site. On May 3, 1983, twenty-seven drums of water from the fire-fighting effort and twenty-three drums of fire-damaged material were removed pursuant to a DEP directive.

The fire alerted DEP to the fact that hazardous materials had been stored in Springer's warehouse in violation of environmental statutes. With the fire out and the fire damage cleaned up,

DEP commenced litigation against Springer, Signo, other tenants of the warehouse, and the transporters of hazardous waste that had been stored illegally on the site. Immediately after the fire an imminent danger to adjacent properties and the local residents existed as a result of the discharge of toxic chemicals and the conditions existing in the warehouse, according to a DEP investigation. The State sought to compel defendants to remove the illegally-stored substances, to remedy fire-code violations, and otherwise to clean up the property.

The trial court directed defendants to clean up the property under DEP's supervision. Defendants did not comply. In June 1984, fourteen months after the fire, the trial court ordered that DEP take possession of the warehouse and conduct a publicly-funded cleanup of Springer's property. DEP cleaned up Springer's property with money from the New Jersey Spill Compensation Fund (the Spill Fund). *N.J.S.A.* 58:10–23.11i. Federal Insurance Company (Federal) had been made a party to the underlying DEP action against Springer when Springer had sought a legal defense and indemnification from Federal with respect to the State's claims.

Federal had issued to Springer a primary CGL policy and an umbrella-liability policy, both of which had been in effect on the date of the fire. The CGL policy contains the following provisions:

> The company will pay on behalf of the insured all sums which the insured shall become obligated to pay as damages by reason of liability to which this insurance applies, imposed by law or assumed by the insured under any written contract, for bodily injury, property damage or personal injury caused by an occurrence and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury, property damage or personal injury, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient. .
>
>   \*    \*    \*    \*    \*    \*    \*    \*
>
> "Property damage" means
> > (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or

(2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

Nor does this insurance apply to:

\*　　\*　　\*　　\*　　\* .　　\*　　\*　　\*

14. property damage to:
   a. property owned \* \* \* by the insured

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

The umbrella-liability policy contains similar provisions and exclusions.

## II

The applicable insurance-law principles are familiar. The most complete statement of those principles by this Court is found in *Meier, supra,* 101 *N.J.* 597, 503 *A.*2d 862. Rather than quote from that opinion at length, I summarize its conclusions.

In New Jersey, that insurance policies are not ordinary contracts but contracts of adhesion between parties who are not equally situated has long been established. *Allen, supra,* 44 *N.J.* 294, 208 *A.*2d 638. Such contracts offer only a take-it-or-leave-it proposition. There is no freedom to negotiate terms. Generally, the person seeking insurance must sign a standardized agreement in order to procure insurance. " 'The very nature and purpose of insurance, *i.e.,* the spreading of individual risks over the entire community, injects into the insurance contract an element of public interest not common to the ordinary contract which normally affects only the parties hereto.' " *Meier, supra,* 101 *N.J.* at 613 n. 11, 503 *A.*2d 862 (quoting Arnold J. Wightman, Note, *Insurance–Construction of Policy Terms,* 1954 *Wis.L.Rev.* 335, 336 (1954)).

Because of the parties' unequal bargaining power, courts have established the doctrine of "reasonable expectations." Recognizing that insurance companies have the expertise and unilaterally prepare the varied and complex insurance policies,

courts have ruled that " 'insurers who seek to impose upon words of common speech an esoteric significance intelligible only to their craft, must bear the burden of any resulting confusion.' " *Id.* at 612, 503 *A.*2d 862 (quoting Judge Learned Hand in *Gaunt, supra,* 160 *F.*2d at 602).

Under that doctrine, courts will enforce only the restrictions and terms in an insurance contract that are consistent with the objectively-reasonable expectations of the average insured. The corollary of that doctrine is that because the insured justifiably places heavy reliance on the knowledge and good faith of the company and its representatives, insurers in turn are under " 'correspondingly heavy responsibilities' to the [insured]." *Meier, supra,* 101 *N.J.* at 613, 503 *A.*2d 862 (quoting *Allen, supra,* 44 *N.J.* at 305, 208 *A.*2d 638). Thus, when " 'several interpretations [are] permissible, we have chosen the one most favorable to the insured.' " *Ibid.*

### III

With the doctrine of reasonable expectations and the foregoing principle of construction in mind, I turn to the specific issues in this case. The Court views the question as posing but a straightforward matter of laying the facts of the case against the terms of the policy to see that coverage is excluded in these circumstances. The resolution of this case, however, is not that simple. Numerous professional journals have documented the difficulties that arise in interpreting the policy provisions at issue here. See Irene A. Sullivan and William J. Wright, Jr., *Hazardous Waste Litigation: CGL Insurance Coverage Issues,* 385 PLI 151 (1990) (hereinafter Sullivan and Wright); Mary K. Vyskocil, *Insurance Coverage Issues Arising Out of Environmental Litigation,* 385 PLI 71 (1990); David E. Novitski, *Business Considerations in Environmental Compliance Activities,* 322 PLI 257 (1988). Those practitioners' manuals categorize the differing interpretations that parties and courts have given the same or similar language in a CGL policy. For

example, one article has reviewed the widely-scattered approaches that courts have taken in interpreting those provisions. That article collected the various decisions under headings such as:

a. Does an insurer have a duty to defend * * * actions arising out of the discharge of hazardous wastes * * *?

b. Is an insurer required to provide a defense when there is no actual lawsuit pending against its insured?

   *     *     *     *     *     *     *     *

d. Does contamination of, or harm to, the environment constitute "property damage" as that term is defined in the typical CGL policy?

e. Do government cleanup costs, or the costs of compliance with mandatory injunctions constitute damages that are recoverable under the terms and conditions of the policies?

   *     *     *     *     *     *     *     *

i. Does the pollution exclusion * * * or any other exclusion effectively preclude coverage?

[Sullivan and Wright, *supra*, 385 PLI at 151.]

Whether one agrees entirely with each of the analyses, they suggest indisputably that several interpretations of the policy language are possible.

Although Federal's brief in opposition to the petition for certification had suggested that "[t]he only issue in this case involves the interpretation of a clause in a contract, *i.e.*, the 'owned property' exclusion which appears in both contracts between Federal and Springer," we permitted supplemental briefs to consider as well the definition of "damages" and of "property damage" under the policy. I believe that interpretation of the term "damages" is actually the more problematic issue for resolution and therefore address it first.

## A.

I begin by restating Federal's rather sweeping promise of coverage to the insured. Springer's CGL policy requires the company "to pay on behalf of the insured all sums which the insured shall become obligated to pay as damages by reason of liability to which this insurance applies, imposed by law * * *

for bodily injury, property damage or personal injury caused by an occurrence." The umbrella-liability policy provides that the insurance company will "pay on behalf of the insured all sums * * * for which the insured shall become obligated to pay by reason of liability (a) imposed * * * by law * * * arising out of personal injury, property damage or advertising liability caused by an occurrence." Federal has emphasized that two conditions must be satisfied before the policy can be called on to respond, derived from the language of the insurer's contractual promise: (1) a third party must have a legal claim for damages against the insured, and (2) the claim for damages must arise because of "property damage" to which the insurance applies. The latter condition involves two aspects: (a) has there been damage to property, and (b) is the property that of another (that point is covered in the "owned-property" exclusion section)?

Some courts find no "damages" at all to have been incurred when the government orders the cleanup of environmental contamination. Those courts view the governmental order as an equitable remedy, distinct from the concept of "damages" in the law. For example, the court in *Continental Insurance Cos. v. Northeastern Pharmaceutical & Chemical Co.*, 842 *F.*2d 977 (8th Cir.) (*en banc*), *cert. denied*, 488 *U.S.* 821, 109 *S.Ct.* 66, 102 *L.Ed.*2d 43 (1988), equated the assessment of cleanup costs under the comparable provisions of CERCLA (the Comprehensive Environmental Response, Compensation and Liability Act), 42 *U.S.C.A.* §§ 9601–75 (1983 & Supp.1992), with equitable relief, and concluded that the term "damages" in the insurance policy had referred only to legal damages and did not cover cleanup costs. *See also Maryland Casualty Co. v. Armco, Inc.*, 822 *F.*2d 1348 (4th Cir.1987) (holding costs of complying with environmental injunction not "damages"), *cert. denied*, 484 *U.S.* 1008, 108 *S.Ct.* 703, 98 *L.Ed.*2d 654 (1988).

That interpretation provides an unworkable distinction and ignores the perspective from which courts interpret the terms of the insurance policy. Interpretation of insurance policies does not hinge on the "esoteric significance" of a distinction

between law and equity totally unrecognizable to those unfamiliar with the long evolution of the law. Thus, the question is: what would a person of common knowledge understand those terms in an insurance policy to cover? I agree with those who have concluded that the assessment of such cleanup costs against an insured constitutes "damages" covered by a CGL policy. *See Township of Gloucester v. Maryland Casualty Co.*, 668 *F.Supp.* 394 (D.N.J.1987) (finding costs of cleanup constitute damages even though underlying lawsuit by DEP sought injunctive relief); *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 *F.*2d 1551 (9th Cir.1991) (holding environmental-cleanup costs incurred pursuant to a consent decree are "damages" covered under policy).

Leading jurisdictions such as California, Washington, Massachusetts, and others have all agreed that environmental-response costs are covered damages under a CGL policy. *See AIU Ins. Co. v. FMC Corp.*, 51 *Cal.*3d 807, 274 *Cal.Rptr.* 820, 799 *P.*2d 1253 (1990) (reimbursement of environmental-response costs constitutes damages within CGL policy); *A.Y. McDonald Indus., Inc. v. Insurance Co. of N. Am.*, 475 *N.W.*2d 607, 620 (Iowa 1991) ("the ordinary meaning of 'damages' is broad enough to include government mandated response on cleanup costs under CERCLA and similar state environmental protection statutes"); *Hazen Paper Co. v. United States Fidelity & Guar. Co.*, 407 *Mass.* 689, 555 *N.E.*2d 576, 583 (1990) (holding cleanup costs covered "damages"; under Massachusetts law, "to consider what an objectively reasonable insured, reading the policy language, would expect to be covered" is "appropriate"; such an insured "would fairly expect that the policy covered amounts he must spend to correct pollution damage for which the law holds him responsible"; costs for preventive measures would not be covered); *C.D. Spangler Constr. Co. v. Industrial Crankshaft and Eng'g Co.*, 326 *N.C.* 133, 388 *S.E.*2d 557, 565, 568 (1990) (holding policyholder's costs of compliance with state-remediation orders were "damages"; term was "not being used in its legal and technical sense in

these policies," and encompassed non-legal costs such as response costs); *Minnesota Mining & Mfg. Co. v. Travelers Indem. Co.*, 457 *N.W.*2d 175, 180–81, 184 (Minn.1990) (finding term "damages" ambiguous; "consistent with the reasonable expectations of the insureds under these policies that the cleanup costs be covered," although costs expended for "[p]urely preventative measures" not covered); *Boeing Co. v. Aetna Casualty & Sur. Co.*, 113 *Wash.*2d 869, 784 *P.*2d 507, 511, 512 (1990) (CERCLA response costs covered as "damages" when state law required that undefined terms in an insurance contract "be given their 'plain, ordinary and popular' meaning"; however, "prophylactic" or "harm-avoidance" costs not covered because under contract terms had to be "because of" property damage).[1]

"Damages" means money to most people. Money is what DEP wants from Springer. One United States District Court in New Jersey has perhaps stated it best: In assessing what an insured would reasonably expect from a CGL policy, it reasoned that "[t]he average person would not engage in a complex comparison of legal and equitable remedies in order to define * * * 'damages', but would conclude based on the plain meaning of words that the cleanup costs imposed on [the insured] * * * would constitute an obligation to pay damages." *American Motorists Ins. Co. v. Levelor Lorentzen, Inc.*, No. 88–1994, 1988 WL 112142 at 3 (D.N.J. Oct. 14, 1988); *see also Avondale Indus., Inc. v. Travelers Indem. Co.*, 697 *F.Supp.* 1314, 1319 (S.D.N.Y.1988) ("The average businessman does not differentiate between 'damages' and 'restitution;' in either case, money comes from his pocket and goes to third parties. * * * The average businessman would consider himself covered for clean-

---

[1] Several unreported cases have also concluded that cleanup costs constitute damages. *See Jones Truck Lines v. Transport Ins. Co.*, 57 *U.S.L.W.* 2699–2700, No. 88–5723, 1989 WL 49517 (E.D.Pa. May 9, 1989) (Superfund-response costs are damages covered by CGL policy under Missouri law; *Polaroid Corp. v. Travelers Indem. Co.*, No. 88–5207 (Mass.Super.Ct. Dec. 5, 1989).

up expenditures applicable to others' properties."), *aff'd*, 887 *F.*2d 1200 (2d Cir.1989).

The District Court in *Intel Corp. v. Hartford Accident and Indemnity Co.*, 692 *F.Supp.* 1171 (N.D.Cal.1988), *aff'd in part, rev'd in part*, 952 *F.*2d 1551 (9th Cir.1991), provided a comprehensive review of the authorities before concluding under California law that investigation and cleanup costs were covered under the terms of a CGL policy. That court explained that " '[e]very person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages.' " *Id.* at 1189 (quoting *Cal.Civ.Code* § 3281).

In short, I believe that the average person would not engage in a complex comparison of whether the remedies of law or equity were being invoked, but would conclude that when money comes from his or her pocket and goes to the pocket of third parties, here the Spill Fund, he or she has suffered "damages" within the terms of the insurance policy.

### B.

The definitions of "property damage" and of the "owned-property" exclusion strike me as less problematic. Under the policy terms, the damages sought must have been incurred because of "property damage" other than "property owned * * * by the insured." Recall that Federal's CGL policy defines "property damage" as "physical injury to or destruction of tangible property * * *, including the loss of use thereof at any time resulting therefrom," or "loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period."

The Appellate Division and the trial court, in its initial decision, seem to have concluded that because the pollution had not yet migrated to the property of others, those properties had suffered no damage. But surely the government did not com-

mence its cleanup operation out of concern to rehabilitate Springer's warehouse. There had been external migration of toxins beyond the insured's property. A DEP scientist had reported the presence of elevated concentrations of arsenic, cadmium, copper, and lead in the public streets surrounding the warehouse. He had determined further that continued migration of those chemicals had been abated by the DEP cleanup and that there had been explosive chemicals on the site that the New Jersey Department of Defense had detonated. DEP had directed its efforts at cleaning up the property to prevent further environmental damage and increased health risks.

The trial court found that perilous and dangerous conditions had existed at the warehouse that had threatened the public health, safety, and welfare. That court held that there was an "obvious risk that if something serious were not done quickly, there might be an additional fire. There might also be seepage along the surface of the ground eventually onto other properties or down through the surface of the ground into the waters of the state." Had that occurred (barring any other policy provision), there would have been coverage for the damage to the property of others.

The law has never required the spread of soil and groundwater pollution over boundary lines before they can be said to have caused the "injury" to other people's property that liability insurance is intended to indemnify. *See* Barry R. Ostrager, *Special Insurance Coverage Issues Arising Out Of Hazardous Waste Environmental Clean–Up Litigation,* C637 ALI–ABA 1061 (1991) (quoting *Shell Oil Co. v. Accident & Casualty Ins. Co.,* No. 278953 (slip op. at 114) (Cal.Super.Ct. Oct. 6, 1988) ("[T]he care, custody and control exclusion does not preclude coverage for cleanup or remedial measures which are taken on excluded property which are solely to prevent or mitigate damage to the third party property.")); *cf. AIU Ins. Co. v. FMC Corp., supra,* 274 *Cal.Rptr.* at 846, 799 *P.*2d at 1279 (holding "that reimbursement of response costs and the costs of injunctive relief under CERCLA and related statutes are incurred

'because of' property damage. * * * This is true, moreover, whether the cleanup at issue * * * takes place on property owned by [the insured] or third parties").

In *State v. New York Central Mutual Fire Insurance Co.*, 147 *A.D.*2d 77, 542 *N.Y.S.*2d 402 (1989), the State had expended money to clean up an oil spill. The insurer had maintained that because the spill had been halted before it reached the neighbor's property the damage was to property owned by the insured and thus excluded from coverage. The court concluded that there was no question that the fuel oil had "entered the groundwater or at the very least threatened to." *Id.* 542 *N.Y.S.*2d at 403. Because, under New York law, groundwater is a natural resource protected by the State as trustee for its people, the court held that the oil spill had caused damage to property other than that of the insured, thereby rendering the "owned-property" clause inapplicable and defendant liable under the policy. *Ibid.*

That is essentially the position taken in *Broadwell Realty Services v. Fidelity & Casualty Co.*, 218 *N.J.Super.* 516, 528 *A.*2d 76 (App.Div.1987). There, the court ruled:

> The obvious purpose of this language [the "owned-property" exclusion] is to exclude from the insurer's indemnification obligation claims by the insured based upon damage or loss to its own property. We recognize that the policy is not designed to afford first party coverage. It is far different to suggest, however, that abatement remedies performed to prevent continued contamination and damage to the property of third parties fall within the exclusionary language. * * * We are thus convinced that abatement remedies designed to prevent imminent and immediate damage to third parties cannot be denied on the basis of the owned-property exclusion.
>
> We stress that this does not, however, include elements of the claim which relate to remedies for damage confined to [the insured's] property. To the extent that all or a portion of the response expenses pertain solely to damage to the [insured] site itself and not to prevent off-site contamination, the owned-property exclusion clearly applies, and such damage is not within the coverage provided.

[*Id.* at 528–29, 528 *A.*2d 76.]

Thus, even had the event or occurrence of the fire been confined exclusively to the insured premises, the insured has

nonetheless become liable to a third party—DEP. When the broad definition of "property damage" in a CGL policy is read together with the "owned-property" exclusion and the policy's introductory paragraphs on liability, "it is clear that coverage is expressly provided when the insured becomes liable to third parties for events confined exclusively to the insureds' premises." *Unigard Mut. Ins. Co. v. McCarty's, Inc.*, 756 *F.Supp.* 1366, 1369 (D.Idaho 1988).

Requiring actual physical migration of hazardous substances to adjacent properties before coverage is triggered fails to take account of basic property-law principles. Never has it been thought that a party whose property or person had been threatened with immediate destruction or injury occasioned by the condition on another's property would not have a cause of action to prevent injury to that property. Abatement of the nuisance is a recognized legal remedy under New Jersey law. *See Birchwood Lakes Colony Club, Inc. v. Borough of Medford Lakes*, 90 *N.J.* 582, 449 *A.*2d 472 (1982) (holding invasion of one's interest in private use and enjoyment of downstream waters may constitute actionable nuisance). There are actually two possible remedies in such a case. One would measure the injury to property interests in terms of damages by computing the difference in property value before and after the threat. *See, e.g., Barberi v. Bochinsky*, 43 *N.J.Super.* 186, 128 *A.*2d 1 (App.Div.1956). The second would allow the injured party to require the offending party to abate the unreasonable use of its property. *See, e.g., Township of Hanover v. Town of Morristown*, 108 *N.J.Super.* 461, 261 *A.*2d 692 (Ch.Div.1969). A third course of action would allow the victim to take steps reasonably necessary to protect his or her own property from injury, including measures confined to that property. *See* Fowler v. Harper et al., *The Law of Torts* § 1.18 (2d ed. 1986). Damage to owned property is legally irrelevant, except to the extent that the owner has derived some benefit from its cleanup.

Following oral argument we inquired of counsel whether the CGL policies at issue in three out-of-state cases—*Boeing Co.*,

*supra,* 784 *P.*2d 507, *Aerojet–General Corp. v. San Mateo County Superior Court,* 211 *Cal.App.*3d 216, 257 *Cal.Rptr.* 621 (1989), and *AIU Insurance Co., supra,* 274 *Cal.Rptr.* 820, 799 *P.*2d 1253—contained an owned-property exclusion of substantial similarity to that found in Signo's CGL policy. Counsel for Springer advised us that to the best of his knowledge all of the Boeing and Aerojet policies contained a similar owned-property exclusion or followed the form of policies containing such an exclusion and noted that the court in *AIU Insurance Co.* referred to the fact that most of the policies at issue there contained owned-property exclusions. See *AIU Ins. Co., supra,* 274 *Cal.Rptr.* at 829 n. 7, 799 *P.*2d at 1262 n. 7. The fact is that most coverage and exclusion clauses that are contained in CGL policies are uniform throughout the industry. *See* 3 Rowland H. Long, *The Law of Liability Insurance* App–29, App–76 (1988). Had the court or counsel in any of the cited cases thought the "owned-property" exclusion of any legal significance in cleanup cases, they would have surely cited or relied on the clauses.

The majority relies on *Western World Insurance Co. v. Dana,* 765 *F.Supp.* 1011 (E.D.Cal.1991), to support its interpretation that the owned-property exclusion results in an absence of coverage. But more recently, the Court of Appeals for the Ninth Circuit (that reviews the decisions of the Eastern District of California) in *Intel Corp. v. Hartford Accident and Indemnity Co., supra,* 952 *F.*2d 1551, repudiated the *Western World* holding. The *Intel* court found coverage under a CGL policy for cleanup costs incurred "to correct any groundwater contamination that ha[d] taken place, and to mitigate any future damage that might occur from the contaminants introduced into the soil and groundwater by [the insured], whether or not on [the insured's] own property." *Id.* at 1565. That court held specifically that the "owned-property" exclusion did not bar coverage of the costs "of preventing *future harm* to ground water or adjacent property that *might arise* from contamination that has already taken place, whether such contamination

has occurred on the [insured's] or others' property." *Ibid.* (Emphasis added). It reasoned from the suggestion in *AIU Insurance Co., supra,* 274 *Cal.Rptr.* 820, 799 *P.*2d 1253, that "where an insured is covered for damage to a third party's property, that insured would reasonably expect coverage for efforts to mitigate that damage, even when the source of the hazard is on the insured's own property." *Intel Corp., supra,* 952 *F.*2d at 1565–66. The majority continues to avoid the clear holding of *Intel* by quoting only part of its opinion. The majority asserts that the *Intel* court would only allow coverage of expenses incurred "to remedy *existing damage to third party property* * * * from contaminants introduced by Intel." *Ante* at 64, 612 A.2d at 939 (adding the emphasis). In fact, the *Intel* court held:

> However, we believe that the trier of fact will nonetheless have to face the task of determining what expenses were incurred to remedy existing damage to third-party property or to prevent further damage to that property from contaminants introduced by Intel, and what expenses were incurred only to remedy damage to property Intel itself controlled. The former expenses are covered by the policy, while exclusion (k) bars coverage of the latter.

*[Intel, supra,* 952 *F.*2d at 1566.]

Other jurisdictions have not interpreted the owned-property exclusion in a CGL policy to deny coverage in these circumstances. To interpret the policy, as the majority does, to require off-site migration of pollutants in order to trigger coverage would frustrate the insured's common-sense expectations of coverage. Would the average insured expect indemnification for all environmental-cleanup costs when only one milliliter of chemicals had migrated from its property, but expect being denied that same protection when a reservoir loaded with pollutants from an environmental spill poses an immediate danger of bursting? Of course not. " 'It would seem strangely incongruous to [the insured] * * * that his policy would cover him for damages to tangible property destroyed through his negligence in allowing a fire to escape but not for the sums incurred in mitigating such damages by

suppressing the fire.'" *Aerojet–General, supra,* 257 *Cal. Rptr.* at 627 (quoting *Globe Indem. Co. v. California,* 43 *Cal.App.*3d 745, 118 *Cal.Rptr.* 75, 79 (1974)). *See also Gerrish Corp. v. Universal Underwriters Ins. Co.,* 947 *F.*2d 1023, 1030–31 (2d Cir.1991) (affirming district court's holding that owned-property clause did not exclude coverage for environmental-response costs that may require insurer to bear cost of cleaning up leakage on insured's property to abate seepage to neighboring property, even though "specific effects of * * * pollution migration ha[d] not been provided"), *cert. denied,* — U.S. ——, 112 *S.Ct.* 2939, 119 *L.Ed.*2d 564 (1992); *Savoy Medical Supply Co. v. F & H Mfg. Corp.,* 776 *F.Supp.* 703, 708–09 (E.D.N.Y.1991) (holding that the "threat to the public" due to contamination of insured's sanitary system placed damages outside the confines of owned-property exclusion because the "interests in a swift cleanup warrant creating incentive for the insured to stop the pollution as soon as possible"); *Boyce Thompson Inst. for Plant Research, Inc. v. Insurance Co. of N. Am.,* 751 *F.Supp.* 1137, 1141 (S.D.N.Y.1990) (holding that "[s]o long as the * * * complaint contains allegations that encompass the possibility that off-site contamination exists or that clean-up was performed to prevent damage to the property of third parties, the owned property exclusion would not be applicable to work done on the property"); *A.Y. McDonald Indus., supra,* 475 *N.W.*2d at 624 (owned-property exclusion does not preclude coverage of costs incurred for preventative measures once contamination has occurred).

I agree that the extent of the policy's protection is not coextensive with government-regulatory powers. As the lower courts have held, coverage for governmental-damage claims exists only to the extent that the insured is required to pay money to prevent immediately-anticipated third-party damages that the parties undoubtedly intended to cover. California, Washington, and Massachusetts would denote the uncovered damages as, in the California Supreme Court's words, "prophylactic measures" or "measures taken in advance of any release

of hazardous waste." *AIU Ins. Co., supra,* 274 *Cal.Rptr.* at 846, 799 *P.*2d at 1279. I agree that property damage to adjacent properties must be "imminent and immediate" for cleanup costs to be covered under the policy terms. *CPS Chem. Co. v. Continental Ins. Co.,* 222 *N.J.Super.* 175, 188, 536 *A.*2d 311 (App.Div.1988); *Broadwell Realty, supra,* 218 *N.J.Super.* at 528, 528 *A.*2d 76. Of course, in the abatement process there may be some interweaving of expenses that can justly be said to abate or cover damage to the insured's property. The trial court correctly directed that those damages be purged and severed from coverage. The insurance coverage had not been intended, nor is it interpreted, to cover first-party damage to Springer's property, even if part of the government-cleanup order included such damage.

## IV

Liability-insurance law cannot be altered to effectuate environmental goals. Insurance policies are not Spill Funds. Federal cannot be asked to pay for the cleanup of the Thomas Street warehouse merely because it has an insurance policy covering those premises. By the same token, the unusual nature of environmental risks and the potentially great ensuing liability cannot alter the usual rules of interpretation applicable to insurance policies.

We must place ourselves in the insured's shoes. Recognizing that insurance companies possess all of the expertise and unilaterally prepare the varied and complex insurance policies, the " 'esoteric significance [of words] intelligible only to their craft,' " *Meier, supra,* 101 *N.J.* at 612, 503 *A.*2d 862 (quoting *Gaunt, supra,* 160 *F.*2d at 602), cannot be invoked to preclude the ordinary and expected coverage that would apply in a situation like this. Surely, the insured would expect that had the occurrence caused pollution damage to neighboring properties (putting aside such issues as coverage under pollution-exclusion clauses), he or she would be covered for the damages.

Were government to charge the insured with the equivalent expenditures in order to prevent such pollution, would not that party conclude that he or she was just as surely covered? Would he or she not say: "I have a liability-insurance policy. I am covered should government assert a claim against me."

One of the difficulties with applying those familiar principles to a case like this is that we tend to see it in the context of the people before us—in the context of a corrupt polluter who poisons the land—in the context of one who has criminally violated the environmental laws of the State of New Jersey. Some of the people involved in that shameful episode on Thomas Street have been prosecuted for their crimes. *See State v. Colbert,* 245 *N.J.Super.* 53, 583 *A.*2d 1145 (App.Div.1990). Those found guilty will have to face the consequences of their actions.

That does not mean that an otherwise valid insurance policy to pay third parties for the occurrences at the insured property cannot be enforced for the benefit of others. We cannot (absent some other provision of the policy) fashion a rule of insurance law for the good insured, but not for the bad. We must ask what the "average" insured, the average good citizen, would expect of his or her CGL policy. What coverage would a corner drugstore owner expect when a fire has occurred in his or her drugstore and dangerous chemicals must be cleaned up under a Spill Fund requirement?

I recognize that insurance proceeds are not the proverbial "free lunch" for society. We all pay for occurrences like this, but the industry is adapting its policies to deal plainly with those risks. *See CPS Chem. Co. v. Continental Ins., supra,* 222 *N.J.Super.* at 190 n. 4, 536 *A.*2d 311 (citation omitted) (new standard-form language expressly excludes coverage for " '[a]ny loss, cost or expense arising out of any governmental direction or request that [the insured] test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants' "). As long as consumers know what they are getting or not

getting when they buy an insurance policy, so be it. These consumers of insurance were entitled to expect, in the absence of the new standard-form language in a CGL policy, that they were covered for the cleanup costs.

I would reverse the judgment of the Appellate Division.

Chief Justice WILENTZ and Justice HANDLER join in this opinion.

*For affirmance*—Justices CLIFFORD, GARIBALDI, STEIN and KING—4.

*For reversal*—Chief Justice WILENTZ, Justices HANDLER and O'HERN—3.