**MORRISON ASSURANCE COMPANY,**
**Plaintiff,**

v.

**NORTH AMERICAN REINSURANCE**
**CORPORATION, Defendant.**

**Civ. A. No. 83–AR–1828–S.**

United States District Court,
N.D. Alabama, S.D.

July 20, 1984.

W. Stancil Starnes, L. Graves Stiff, III, Starnes & Atchison, Birmingham, Ala., for plaintiff.

Jack B. Porterfield, Jr., William Dudley Motlow, Porterfield, Scholl, Bainbridge, Mims & Harper, Birmingham, Ala., for defendant.

## MEMORANDUM OPINION

ACKER, District Judge.

Plaintiff, Morrison Assurance Company (Morrison), initially filed this action against defendant, North American Reinsurance Corporation (NARe), on only one theory, namely, Count I, which charged the breach of a contract of reinsurance. Morrison, a casualty insurance company, had issued its basic liability insurance policy to Sand Mountain Coal Company, plus its umbrella policy to cover excess liability over the basic coverage, and had obtained a reinsurance contract with NARe only as to the umbrella. After filing its complaint against NARe, Morrison amended to add two more theories of liability or counts, namely, Count II, which charged a "bad faith" refusal by NARe to honor its contractual obligation, and Count III, which charged fraud by NARe for an alleged overt misrepresentation of material fact upon which Morrison relied to its detriment. The central undisputed fact is that Sand Mountain Coal Company, Morrison's insured, was sued in a state court by two farmers in separate cases. The original complaints only sought recovery for property damage as the result of strip mining. After several amendments to the complaints, one complaint contained a claim for mental anguish. The farmer who did not complain of mental anguish obtained a general jury verdict against Sand Mountain of $250,000. The farmer who complained of mental anguish obtained a general jury verdict of $500,000. In other words, the $250,000 verdict necessarily represented only property damage even though the value of the real property was less than $250,-000, whereas the $500,000 verdict is impossible to allocate between property damage and mental anguish. No one can know what the jury intended. Theoretically, the $500,000 verdict may have represented $250,000 property damage and $250,000 for mental anguish; or it may have represented $150,000 property damage and $350,000 for mental anguish; or it may have represented $100.00 property damage and $499,-900.00 for mental anguish; or any other combination of figures adding up to $500,-000. If the claim by the second farmer constituted a second "occurrence" (as NARe's witnesses testified), then there were arguably two exposures under the basic policy to the coverage for property damage ($250,000) and one exposure under the basic policy to the coverage for mental anguish ($300,000), which will be discussed *infra*. The two contiguous farms arguably were not simultaneously damaged because the bad water caused by Sand Mountain's blasting had to go downstream from one farm into the other. Sand Mountain, through counsel furnished by Morrison, gave timely notice of appeal to the Supreme Court of Alabama, but after a careful evaluation of its chances on appeal, and after consultation with NARe, Morrison dismissed its appeal, and the verdicts were thereupon compromised and settled. The $250,000 verdict was settled for $225,000 and the $500,000 verdict was paid in full.

Morrison and NARe simply interpreted their reinsurance contract differently. The Court does not question the honesty of the disagreement. They disagreed then and now as to how much of the jury verdicts, if any, was to be borne by Morrison and how much by NARe. Pursuant to NARe's interpretation of its obligation under all of the circumstances, NARe sent Morrison its check for $170,625. Morrison cashed the check without prejudice. Thereafter, Morrison filed the instant action.

The evidence offered by Morrison in support of its Count III, the "fraud" claim, was not of an affirmative act of misrepresentation, as it had alleged, but rather of a non-disclosure of NARe's thoughts as to what it intended to pay Morrison under the reinsurance contract. Morrison accompanied this evidence by opinion testimony that a confidential relationship existed between the parties out of which a duty of such disclosure allegedly arose. Morrison's fraud theory, as it was actually tried, included the conclusory argument that but for the nondisclosure it would not have dismissed its appeal to the Alabama Supreme Court and would not have paid the jury verdicts. It argued to the jury that the nondisclosure misled it into believing that NARe agreed with it as to NARe's liability. After the Court articulated to counsel its worry over allowing Morrison to amend after it rested, the Court nonetheless granted Morrison leave to amend its Count III allegedly to conform to the evidence, and, in effect, to change entirely the thrust and theory of its "fraud" count. The Court was bothered by the implication inherent in Rule 9(b) F.R.Civ.P., which requires that the facts constituting an alleged fraud be set forth with particularity, but went ahead and allowed the change in the allegations.

After Morrison rested, the Court granted NARe's motion for directed verdict as to Count II (the "bad faith" claim). The said ruling is not contested by Morrison. Also, after NARe rested, the Court denied NARe's motion for a directed verdict as to Count I (the contract claim), and took under advisement NARe's motion for a directed verdict as to Count III (the fraud claim). In response to special interrogatories, the jury decided that NARe had not breached its contract with Morrison but rather had paid Morrison what it owed under its contract of reinsurance. Next, the jury decided that NARe was, in fact, guilty of fraud, and that Morrison had, in fact, suffered some actual damage as a result of the fraud. The jury assessed punitive damages against NARe in the amount of $500,000.00.

The Court now has for consideration (1) Morrison's motion for a new trial as to Count I (the contract claim); (2) NARe's still pending motion for directed verdict as to Count III (the fraud claim) taken under advisement before the jury retired; and (3) NARe's post-trial motion for judgment notwithstanding the verdict as to Count III (the fraud claim).

*The Contract Claim*

The jury's finding that NARe did not breach the reinsurance agreement was not only supported by the substantial evidence required by *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir.1969), but under the undisputed facts and circumstances bearing upon the interpretation, the Court now concludes that NARe correctly interpreted its contract as a matter of law, that is, unless it overpaid Morrison. There was only one contractual provision which was sufficiently ambiguous to call for jury resolution, namely, whether or not there was more than one "occurrence". When NARe withdrew its counterclaim this issue became less important. The Court was in error in permitting the jury to decide the contract issue presented by Count I. But the jury's decision renders any such error moot. As the Court now views the undisputed evidence, the language in the pertinent documents, construed *in pari materia*, and against their respective draftsmen, are not sufficiently ambiguous to leave any real doubt as to the intent of the parties, although they undoubtedly failed to anticipate precisely this set of circumstances. Therefore, the jury here did no more than

to agree with the Alabama law for ascertaining the meaning of a contract. The pertinent documents are: (1) the basic or underlying insurance policy issued by Morrison to Sand Mountain; (2) the umbrella policy issued by Morrison to Sand Mountain; and (3) the reinsurance contract itself.

*The Basic Policy*

■ The basic policy contained coverages for "bodily injury" in the amount of $300,000.00 for each person and for each occurrence and coverage for "property damage" in the amount of $250,000.00 for each occurrence.

The "definitions" section defines "bodily injury" as follows:

> "Bodily injury" means bodily injury, *sickness* or *disease* sustained by any person which occurs during the policy period, including death at anytime resulting therefrom. (emphasis supplied)

"Property damage" is defined as follows:

> "Property damage" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed providing such loss of use is caused by an occurrence during the policy period.

The words "mental anguish" as contained in the complaint are nowhere contained in the basic policy. Construing the language against Morrison, as it must be, "mental anguish" is necessarily included within the terms "sickness" or "disease". Morrison's argument that "mental anguish" in this particular case constitutes "property damage" is ingenious but spurious.

*The Umbrella Policy*

■ The umbrella policy first refers to the "underlying limits of liability" as being $300,000/$300,000 "BA" [bodily injury] and $250,000/$250,000 "PD" [property damage]. It nowhere uses the term "bodily injury" which is used in the basic policy. Instead, it uses the term "personal injury", and defines it as follows:

> "Personal injury" means (1) bodily injury, *sickness, disease, disability* or *shock,* including death arising therefrom, or, if arising out of the foregoing, mental anguish and mental injury ... (emphasis supplied).

In other words "mental anguish" which arises from the "shock" or "sickness" or "disease" or "disability" indirectly resulting from damage to a person's property is embraced within the term "personal injury".

"Property damage" in the umbrella policy is defined as follows:

> Injury to or destruction of tangible property, other than property owned by a named insured, and all loss resulting therefrom.

*The Reinsurance Agreement*

The reinsurance agreement which backed up the umbrella recites as the "Policy Limits and Application" the following:

> $1,000,000.00 each occurrence and in the aggregate *excess of underlying limits of primary insurance* or $10,000 retention. (emphasis supplied).

The "loss payable" portion of the reinsurance agreement says:

> All insurance policy claims involving this reinsurance, when settled by the Company [Morrison], shall be binding on the Reinsurer [NARe], which shall be bound to pay its proportion of such settlements promptly following receipt of proof of loss in the following manner:
>
> (1) *If this reinsurance is on an excess of loss basis, the amount of the Reinsurer's liability for loss hereunder shall be its indicated proportion of the excess amount, if any, by which ultimate loss to the policy exceeds the amount or amounts in excess of which this reinsurance attaches, after first having deducted all recoveries or recoverables (collectible or not), from any source* except those from such portions of other excess of loss reinsurances which do not overlap or duplicate this coverage. (emphasis supplied).

This Court deems it unnecessary to conduct a detailed analysis of all of this contract language in the context of the state court complaints and the general jury verdicts against Sand Mountain. Suffice it to say that any possible ambiguity was resolved by the jury in favor of NARe. Therefore, Morrison's motion for a new trial as to Count I is due to be denied.

### The Fraud Claim

There are several reasons, any one of which is sufficient, why the jury award of punitive damages under Count III cannot stand, and why NARe's motion for directed verdict as to Count III should now be granted.

FIRST: The Court cannot find substantial evidence of actual damage to support a punitive award. A scintilla will not suffice in a federal court as it might in an Alabama court. Neither will a presumption of actual damages suffice in a federal court. Without any breach of the contract it is extremely difficult, if not impossible, to find any *actual* damage here. Morrison's theory of fraud, contrary to its pleading in the pre-trial order, was the suppression or withholding from Morrison of NARe's interpretation of the reinsurance agreement, which, according to the very same jury which found fraud, was the *correct* interpretation. While nominal damage can support an award of punitive damages, there must be *some* damage. The Court here simply cannot find any. The mere fact, if it be a fact, that Morrison dismissed Sand Mountain's appeal to the Supreme Court and then paid the two farmers, even if done in the mistaken belief that NARe was in agreement with Morrison's contention as to the extent of NARe's liability, would only permit the grossest of speculation to allow the jury to conclude that Morrison would have acted differently absent that mistaken belief. The lawyer which Morrison chose to defend Sand Mountain advised Morrison to dismiss the appeal and to compromise the verdicts. Can this jury be permitted to decide that Morrison would have ignored its own lawyer's strong advice? It would be just as gross a speculation to assume that if Morrison had ignored its lawyer's advice and had pursued its appeal it would have been victorious in the Supreme Court. This requires a prediction of the outcome in the Supreme Court. This Court cannot predict the Eleventh Circuit, much less the Supreme Court of Alabama, so why should a jury be allowed to speculate about it? Thus, not only is the essential element of "actual damage" lacking in this case, but the essential elements of "reliance" by Morrison and "to its detriment" are also lacking.

SECOND: If anything was concealed from Morrison by NARe it was simply an *opinion* and not a *material fact*. That NARe held an opinion different from Morrison's opinion as to the proper allocation of the various insurance coverages was, in one sense, a "fact", but it was not the kind of "fact" contemplated by § 6–5–102, Code of Ala. (1975) to form the basis for a fraud claim.

THIRD: Although Morrison offered opinion testimony to the effect that a confidential relationship always exists by and between a reinsurer and its reinsured (a confidential relationship being the *sine qua non* of an affirmative duty to disclose), the Court finds that the parties here were both sophisticated, experienced insurance companies, dealt at arms length, and that as a matter of law NARe owed no duty to reveal to its reinsured its own internal thoughts, plans, suspicions and legal opinion. To hold otherwise would be to make every contractual relationship into one of "confidentiality" by the expedient of allowing expert testimony to say that such a relationship is one of trust.

FOURTH: Even if NARe indirectly misled Morrison, Morrison had an obligation reasonably to look out for its own interest under the admitted circumstances. Morrison was certainly just as guilty of not revealing to NARe its interpretation of their agreement as NARe was guilty of not disclosing to Morrison its interpretation of their agreement. This fact overlaps the question discussed *supra* of the *reason-*

*ableness* of Morrison's reliance on what it says it thought was NARe's interpretation.

FIFTH: The leading Eleventh Circuit case which discusses punitive damages in Alabama fraud cases is *P & S Business Machines v. Olympia U.S.A.*, 707 F.2d 1321 (11th Cir.1983). The Eleventh Circuit held at 707 F.2d 1325:

> Punitive damages may be recovered in a fraud action under Alabama law if the fraudulent misrepresentation was *malicious, oppressive or gross, made with knowledge of its falseness*, or so recklessly made as to amount to the same thing, *and made with the purpose of injuring the plaintiff.* (emphasis supplied).

Various expressions by the Supreme Court of Alabama contain the possible implication that the only variety of fraud which can trigger punitive damages is the *affirmative* variety which Morrison first alleged but did not prove. However, assuming that the suppression or concealment of a fact (here it was not a "fact" but an "opinion") can give rise to punitive damages, there was no substantial evidence in this case to prove that NARe *purposefully or intentionally set out to injure* Morrison by withholding from Morrison NARe's interpretation of the agreement.

SIXTH: Last and perhaps most important (but unknown to the Court when it permitted Morrison to amend its Count III to conform to the evidence), an opinion was about to be rendered on the very subject with which this Court was wrestling at the end of the testimony, namely, the effect of Rule 9(b), F.R.Civ.P., on the right to amend a fraud claim at or after trial. In this case Morrison's complaint and the pre-trial order charged only an affirmative act of misrepresentation by NARe. After expressing its considerable reservation, this Court finally allowed Morrison to amend its complaint at the close of its case to charge fraud by concealment, an entirely different theory under the Alabama statutory scheme for alleging fraud. This amendment was filed on June 7, 1984 and the jury rendered its verdict on the same day. On June 8, 1984, one day later, the Supreme Court of Alabama announced its decision in *State Farm Fire & Casualty Co. v. Fincher*, 18 A.B.R. 2051, 454 So.2d 936 (Ala. 1984). While the interpretation of Rule 9(b), Alabama Rules of Civil Procedure, by the Supreme Court of Alabama is not binding on this Court which is called on to interpret Rule 9(b), F.R.Civ.P., the rules are identical and it is intriguing that the identical issue which this Court faced on June 7, 1984, was answered by the Alabama Court on June 8, 1984. This Court is persuaded by the reasoning of the Alabama Court. The Alabama Court unanimously concluded that Rule 9(b) limits the right of amendment during trial where fraud is the issue, because fraud must be pled with particularity for the purpose of advising the defendant *in advance of trial* exactly what the defendant is called upon to defend against. Here, if NARe had known *before trial* that it was being charged with concealment, as opposed to affirmative fraud, it may have been better prepared to meet the "expert" testimony as to the custom and practice of confidentiality and trust as between a reinsurance company and its reinsured. In light of this Court's finding that no such relationship here existed, NARe's lack of counterveiling evidence on the "confidentiality" issue may be academic in this case, but it illustrates the correctness of the Alabama Court's reasoning.

Making the prejudice in allowing Morrison's amendment more obvious in a federal court than in an Alabama court is the fact that the Alabama Rules of Civil Procedure do not contain Rule 16(e) which says:

> This order shall control the subsequent course of the action unless modified by a subsequent order. The order following a final pretrial conference shall be modified only to prevent manifest injustice.

In this case not only did the Court not expressly modify the pretrial order which sounded only in overt fraud, but the belated amendment, according to the rationale in *Fincher, supra*, probably caused "manifest injustice" rather than prevented it.

If this Court had not erroneously allowed the amendment, there would have been a fatal variance between Morrison's proof of

fraud and the fraud it alleged. Therefore, for this and the other reasons hereinabove discussed, the Court should now grant NARe's motion for a directed verdict as to Count III.

### Excessiveness

In *Dempsey v. Auto Owners Ins. Co.,* 717 F.2d 556 (11th Cir.1983), the Eleventh Circuit dealt with the issue of excessiveness in an award of punitive damages. At 717 F.2d 562 it concluded as a matter of law:

> This award is generous; it is excessive; it is based in part on bias, passion, or other improper causes.

In view of the highly speculative nature of any actual damage here, and of the absence of any real evidence of malice or oppressive misconduct, punitive damages in the amount of $500,000.00 is a clear indication of "bias, passion, or other improper causes", and the verdict, if not directed for NARe, would have to be set aside or drastically reduced for excessiveness.

An appropriate order will be entered.