AMERICAN STATES INSURANCE
COMPANY, Plaintiff,

v.

HANSON INDUSTRIES, Successor–In–In-
terest to U.S. Industries, Inc. and Wyatt
Industries, Inc.; Insurance Company of
North America; Travelers Insurance
Company; and American Motorists In-
surance Company, Defendants.

Civ. A. No. H–93–3331.

United States District Court,
S.D. Texas.

Jan. 4, 1995.

Murray J. Fogler, McBade & Fogler, Houston, TX, Gene Francis Creely, II, Boswell & Hallmark, Houston, TX, John R. Pearson, Sewell & Riggs, Houston, TX, Michael R. Ross, Houston, TX, for defendants.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court is Plaintiff American States Insurance Company's ("American States") Motion for Partial Summary Judgment (Docket Entry # 41), Defendant Insurance Company of North America's ("INA") Motion for Partial Summary Judgment (Docket Entry # 39), Defendant Travelers Insurance Company's ("Travelers") Motion for Partial Summary Judgment (Docket Entry # 40), and Defendant American Motorists Insurance Company's ("AMICO") Motion for Partial Summary Judgment (Docket Entry # 42). American States, INA, Travelers, and AMICO (collectively "the Insurers") move for partial summary judgment on the issue of their obligation to defend Defendants Wyatt Industries ("Wyatt") and U.S. Industries, Inc. ("USI") in two causes of action filed in state court relating to pollution of a site previously owned by Wyatt and USI.

Also pending before the court is Wyatt's and USI's (collectively "the Insured") Cross–Motion for Partial Summary Judgment (Docket Entry # 47). Having reviewed the motions, the submissions of the parties, the pleadings, and the applicable law, this court is of the opinion that the Insurers' motions for partial summary judgment should be granted, and the Insured's cross-motion for partial summary judgment should be denied.

### I. *Background.*

Wyatt Metal & Boilerworks, Inc. was formed in 1917, incorporated in 1956, and changed its name to Wyatt Industries, Inc. in 1959. In 1968, USI gained control of Wyatt through a merger of the two companies. Hanson Industries, Inc. ("Hanson") subsequently purchased USI in 1983. Today, Hanson controls the assets of USI and Wyatt.

In 1952, Wyatt purchased a thirty-acre tract of land on Old Katy Road in Houston,

Christopher W. Martin, Bracewell & Patterson, Houston, TX, for plaintiff.

Texas ("the Site"), for the purpose of building and operating a plastics and rubber plant. Wyatt divided the Site into two tracts, the "Fluorocarbon Tract," which eventually contained a plastic and rubber manufacturing facility, and the "Wyatt Tract." Wyatt operated a plastics and rubber plant on the Fluorocarbon Tract from 1962 to 1968.

In 1968, Wyatt merged with USI. In conjunction with the merger, Wyatt conveyed all thirty acres of the Site to USI. USI continued the production of molded plastic and rubber products on the Fluorocarbon Tract from May 31, 1968, to March 27, 1978, when it sold six acres of the tract to Plastic and Rubber Products, Inc. ("PRP"). While PRP did not purchase the remaining six acres of the Fluorocarbon Tract until June 7, 1981, it owned and operated the molded plastics plant on the Fluorocarbon Tract from March 1978, until February 29, 1984, when it sold the Fluorocarbon Tract to The Fluorocarbon Company. Likewise, The Fluorocarbon Company continued the production of molded plastic and rubber products on the Fluorocarbon Tract until late 1985.

Thus, from 1962 until 1985, the Fluorocarbon Tract was used for the manufacture of plastic and rubber products. This process involved the injection of raw plastics and rubber into molds, thereby forming the desired product. As part of the manufacturing process, formic acid and methylene chloride were used to remove plastic and rubber residue from the molds, and degreasing chemicals, including trichloroethane and 1,1,1–trichloroethane, were used to remove oil and grease from various molds and metal forms.

Throughout the years that plastic and rubber products were manufactured on the Site, the manufacturers discarded most of their degreasing chemicals by dumping them on the ground outside of the manufacturing building located on the Site. The remaining degreasing chemicals were stored in fifty-five gallon tanks that leaked on the ground outside of the manufacturing building. The manufacturers stored the formic acid and methylene chloride in similar tanks that also leaked on the land surface of the Site.

The manufacturers' manner of disposing of the chemical wastes eventually led to the deposit of trichloroethane, 1,1,1–trichloroethane, and methylene chloride on and in the soil and groundwater at the Site. Furthermore, the chemical pollutants that leaked out of the storage tanks and drums seeped into the ground of the Site.

Approximately one year after purchasing the property from PRP, The Fluorocarbon Company entered into a sales contract dated January 1985 with The Home Depot for the sale of the Fluorocarbon Tract. As a result of the pending sale and The Home Depot's desire to build a retail outlet on the Site, an environmental survey of the Site was conducted on behalf of The Home Depot by Resource Engineering, Inc. ("REI"). In March and August 1985, REI issued reports identifying the presence of hazardous wastes in the soil and groundwater at the Site, including trichloroethane and methylene chloride. The August 1985 report further recommended that four "hot spots" of soil contamination be removed and that groundwater contamination be remediated by a groundwater recovery system.

Following a site inspection on November 8, 1985, the Texas Water Commission issued a Notice of Deficiency on November 15, 1985, to The Fluorocarbon Company referring to the presence of soil and groundwater contamination and the fact that hazardous wastes had been stored on the Site longer than 90 days. The Fluorocarbon Company responded to the Notice of Deficiency by submitting a formal "closure" plan on December 15, 1985, which indicated its desire to dismantle the plant.

The Texas Water Commission notified The Fluorocarbon Company on December 17, 1985, that dismantling the plant did not constitute site closure and did not remedy the violations noted in the recent site inspection. The Texas Water Commission further required The Fluorocarbon Company to submit a waste facility closure plan detailing procedures for soil and groundwater clean-up by January 20, 1986. The Fluorocarbon Company, however, never complied with this requirement; rather, it discontinued its manufacturing operations, dismantled its plant and

equipment, and sold the property to The Home Depot on January 6, 1986.

The Home Depot, in turn, sold the Fluorocarbon Tract just twenty days later, on January 28, 1986, to the Old Katy Road 28 Limited ("OKR"), with Michael Kenny ("Kenny") as the general partner. In addition, OKR purchased the Wyatt Tract from the Insured on September 9, 1985.

OKR was able partially to clean up the contaminated soils on the site through an amended closure plan which REI submitted to the Texas Water Commission on OKR's behalf on July 9, 1986. Yet, the Water Commission required further information regarding the extent of the groundwater contamination before the Site could be designated as fully cleaned. Consequently, REI made supplementary studies of the groundwater on the Site and submitted a report to OKR on October 10, 1987, which identified extremely high concentrations of trichloroethane in the groundwater.

OKR filed suit against Wyatt and USI on January 27, 1988, alleging that Wyatt's and USI's actions in polluting the Site were "abnormally dangerous" and resulted in a public nuisance. *Old Katy Road 28 Limited v. The Fluorocarbon Company,* No. 88–3800 (127th Dist. Ct., Harris County, Tex., filed Jan. 27, 1988). OKR sought recovery from Wyatt and USI on theories of strict liability, negligence, misrepresentation, gross negligence, and violations of the Texas Deceptive Trade Practices Act and sought damages for diminution in the property value of the Site, future clean-up costs, and loss of future profits. Furthermore, Kenny, also a plaintiff to the suit, sought recovery for mental anguish and emotional distress.

In addition, the Federal Deposit Insurance Corporation ("FDIC"), as successor-in-interest to a mortgagee of the Site, brought an action against Wyatt and USI on September 8, 1989, seeking injunctive relief under the Resource Conservation and Recovery Act. *FDIC v. Fluorocarbon Company,* No. H–89–3068 (S.D.Tex. filed Sept. 8, 1989).

On February 7, 1992, a settlement agreement was reached between the parties of both suits, whereby a group of defendants in the OKR suit, including Wyatt and USI, agreed to pay for the clean-up of the contaminated land. Wyatt and USI, in turn, sought indemnity and defense from the insurance companies that insured them between 1962 and 1985. These insurance companies are American States, which insured Wyatt and USI between January 1, 1960, and April 1, 1971; Travelers, which insured USI from April 1, 1971, to April 1, 1972; INA, which insured USI between April 1, 1972, and April 1, 1976; and AMICO, which insured USI between April 1, 1976, and April 1, 1985. On October 20, 1993, American States filed the instant declaratory judgment action seeking a declaration that it does not owe Wyatt or USI coverage under its policies and asking the court to adjudicate the rights of USI's other insurers, as well.

## II. *Analysis.*

### A. *The Applicable Standard.*

Rule 56(c) provides that "[summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Williams v. Adams,* 836 F.2d 958, 960 (5th Cir.1988). Once a proper motion has been made, the non-moving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. at 322–23, 106 S.Ct. at 2552; *Anderson v. Liberty Lobby,* 477 U.S. at 257, 106 S.Ct. at 2514; *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.),

*cert. denied,* ⸺ U.S. ⸺, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). Summary judgment is mandated if the non-movant fails to make a showing sufficient to establish the existence of an element essential to the nonmovant's case on which it bears the burden of proof at trial. *Celotex v. Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552.

### B. *The Duty to Defend.*

 Insurers have a duty to defend their policyholders in actions which assert claims covered by the insurance policy. *Gulf States Ins. Co. v. Alamo Carriage Serv.,* 22 F.3d 88, 90 (5th Cir.1994); *Gulf Chem. & Metallurgical Corp. v. Associated Metals & Minerals Corp.,* 1 F.3d 365, 369 (5th Cir. 1993); *Enserch Corp. v. Shand Morahan & Co., Inc.,* 952 F.2d 1485, 1492 (5th Cir.1992); *Fidelity & Guar. Ins. Underwriters, Inc. v. McManus,* 633 S.W.2d 787, 788 (Tex.1982); *Heyden Newport Chem. Corp. v. Southern Gen. Ins. Co.,* 387 S.W.2d 22, 24 (Tex.1965). In Texas, a court determining an insurer's duty to defend its insured follows the "eight corners" rule. *Cullen/Frost Bank v. Commonwealth Lloyd's Ins. Co.,* 852 S.W.2d 252, 255 (Tex.App.—Dallas 1993, writ denied). Under this rule, a court looks only to the pleadings and the insurance policy at issue to determine whether a duty to defend exists. *Gulf States Ins. Co. v. Alamo Carriage Serv.,* 22 F.3d at 90; *Gulf Chem. & Metallurgical Corp. v. Associated Metals & Minerals Corp.,* 1 F.3d at 369; *Enserch Corp. v. Shand Morahan & Co., Inc.,* 952 F.2d at 1492; *Cullen/Frost Bank v. Commonwealth Lloyd's Ins. Co.,* 852 S.W.2d at 255; *Fidelity & Guar. Ins. Underwriters, Inc. v. McManus,* 633 S.W.2d at 788; *Heyden Newport Chem. Corp. v. Southern Gen. Ins. Co.,* 387 S.W.2d at 24. For such a duty to arise, "the pleadings must allege a claim that is 'potentially' covered by the applicable policy." *Gulf States Ins. Co. v. Alamo Carriage Serv.,* 22 F.3d at 90; *Enserch Corp. v. Shand Morahan & Co., Inc.,* 952 F.2d at 1492; *Fidelity & Guar. Ins. Underwriters, Inc. v. McManus,* 633 S.W.2d at 788; *Heyden Newport Chem. Corp. v. Southern Gen. Ins. Co.,* 387 S.W.2d at 24. In making this analysis, a court should not consider the truth or falsity of the allegations in the underlying pleadings. *En-*

*serch Corp. v. Shand Morahan & Co., Inc.,* 952 F.2d at 1492; *Cullen/Frost Bank v. Commonwealth Lloyd's Ins. Co.,* 852 S.W.2d at 255; *Argonaut S.W. Ins. Co. v. Maupin,* 500 S.W.2d 633, 635 (Tex.1973); *Heyden Newport Chem. Corp. v. Southern Gen. Ins. Co.,* 387 S.W.2d at 24. An insurer does not have a duty to defend, however, when the plaintiff's petition makes allegations which, if proved, would place the plaintiff's claim within an exclusion from coverage. *Gulf States Ins. Co. v. Alamo Carriage Serv.,* 22 F.3d at 90; *Barnett v. Aetna Life Ins. Co.,* 723 S.W.2d 663, 665 (Tex.1987); *Puckett v. U.S. Fire Ins. Co.,* 678 S.W.2d 936, 938 (Tex.1984); *Holmes v. Employers Casualty Co.,* 699 S.W.2d 339, 340 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.); *Fidelity & Guar. Ins. Underwriters, Inc. v. McManus,* 633 S.W.2d at 788.

### C. *Interpretation of the Insurance Policies.*

 Under Texas law, interpretation of insurance contracts is governed by the same rules that apply to the interpretation of other contracts. *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133 (Tex.1994); *Gomez v. Hartford Co. of the Midwest,* 803 S.W.2d 438, 441 (Tex.App.—El Paso 1991, writ denied) (citing *United States Fire Ins. Co. v. Aetna Casualty Co.,* 781 S.W.2d 394, 398 (Tex. App.—Houston [1st Dist.] 1989, no writ)). The contract is considered as a whole and each part is to be given effect. *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d at 133; *Royal Indem. Co. v. Marshall,* 388 S.W.2d 176, 180 (Tex.1965). Moreover, specific provisions in the contract control over general statements of coverage. *See Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d at 133; *see also* 3 ARTHUR L. CORBIN, CONTRACTS §§ 545–54 (1960). Finally, the terms used in an insurance contract are given their ordinary and generally accepted meaning, unless the policy shows the words were meant in a technical or different sense. *Tri County Serv. Co. v. Nationwide Mut. Ins. Co.,* 873 S.W.2d 719, 721 (Tex.App.—San Antonio 1993, writ denied); *Security Mut. Casualty Co. v. Johnson,* 584 S.W.2d 703, 704 (Tex.1979). After considering the rules of interpretation, sum-

mary judgment is appropriate in cases where the language at issue in the contract is unambiguous. *Tri County Serv. Co. v. Nationwide Mut. Ins. Co.*, 873 S.W.2d at 721 (citing *Phillips v. Union Bankers Ins. Co.*, 812 S.W.2d 616, 617 (Tex.App.—Dallas 1991, no writ)).

### D. *The Insurance Policies.*

Fifteen policies are at issue in this case. American States issued five policies for the period beginning January 1, 1960, through April 1, 1971. Travelers issued one policy which provided coverage from April 1, 1971, to April 1, 1972. INA issued two policies providing coverage between April 1, 1972, and April 1, 1976, and AMICO issued seven policies between April 1, 1976, and April 1, 1985.

Each of these insurance policies contains exclusions precluding coverage under certain circumstances. The Insurers claim that they were not required to defend Wyatt or USI in the OKR suit or the FDIC suit because coverage on the claims asserted in those actions is specifically excluded by the respective insurance policies.

### 1. *The Alienated and Owned Property Exclusion.*

Each of the fifteen insurance policies at issue contains exclusions precluding coverage for damage to property owned by USI or Wyatt ("the owned property exclusion") or alienated by USI or Wyatt ("the alienated property exclusion"). These exclusionary clauses contain boilerplate language used in most modern commercial liability insurance policies and have been the subject of considerable litigation. *See Figgie Int'l, Inc. v. Bailey,* 25 F.3d 1267, 1270 (5th Cir.1994); *Reliance Ins. Co. v. Povia–Ballantine Corp.,* 738 F.Supp. 523, 525 (S.D.Ga.1990); *Taylor–Morley–Simon, Inc. v. Michigan Mut. Ins. Co.,* 645 F.Supp. 596, 600 (E.D.Mo.1986); *Cullen/Frost Bank v. Commonwealth Lloyd's Ins. Co.,* 852 S.W.2d at 259; *New Jersey v. Signo Trading Int'l, Inc.,* 130 N.J. 51, 612 A.2d 932, 939 (1992).

### a. *The Alienated Property Exclusion.*

The alienated property exclusion bars recovery for property damage to prem-ises alienated by the insured. The language used in the clause is clear and unambiguous. *See Reliance Ins. Co. v. Povia–Ballantine Corp.,* 738 F.Supp. at 525; *Taylor–Morley–Simon, Inc. v. Michigan Mut. Ins. Co.,* 645 F.Supp. at 600. The exclusionary clause applies "so long as the plaintiff's alleged damages are incurred after the sale" of the property. *Reliance Ins. Co. v. Povia–Ballantine Corp.,* 738 F.Supp. at 525. The date of the negligent act is entirely irrelevant. *Id.*

In the instant case, the Insured sold six acres of the Fluorocarbon Tract to PRP on March 27, 1978, and sold the remaining acreage of the Fluorocarbon Tract to PRP on June 7, 1981. The Insured also sold the Wyatt Tract to OKR on September 9, 1985. OKR, however, did not begin to pay costs for property clean-up until after July 9, 1986, when its amended closure plan was approved by the Texas Water Commission. Therefore, OKR did not incur damages until after it purchased the property. Accordingly, the alienated property exclusionary clauses in the insurance policies at issue bar coverage for the costs that OKR expended in cleaning up the Site.

Additionally, the FDIC sought to recover costs expended in studying and analyzing the pollution, in litigation, and in obtaining an injunction ordering Wyatt and USI to create and implement a plan to clean up all pollution on the Site. The FDIC is the receiver of University Savings and Loan, the mortgagee of the Site. University Savings and Loan issued a mortgage on the Site in 1985 and 1986 when OKR purchased the Wyatt Tract and the Fluorocarbon Tract, respectively. Therefore, the alienated property exclusion also bars recovery for costs incurred by the FDIC as receiver of University Savings and Loan, just as it bars recovery for OKR. The FDIC also requested an injunction ordering the Insured to clean up the Site, a task to take place in the future, but the FDIC did not file suit until September 8, 1989, well after the Insured sold all of its rights to the Site.

Thus, the Insurers were not required to defend Wyatt or USI in the OKR or FDIC suits, as both suits pertain to property alien-

ated by the Insured, something for which coverage is specifically excluded by the policies at issue.

### b. *The Owned Property Exclusion.*

█ The "owned property exclusion" provides, with minor variations, that the policies do not apply "to property damage to ... property owned or occupied by or rented to the insured." It precludes coverage for the costs of cleaning up contamination that is limited exclusively to the policyholder's property. *See generally Figgie Int'l, Inc. v. Bailey,* 25 F.3d at 1270, 1274; *see also Travelers Ins. Co. v. Waltham Indus. Labs. Corp.,* 722 F.Supp. 814, 829 (D.Mass.1988), *aff'd in part and rev'd in part on other grounds,* 883 F.2d 1092 (1st Cir.1989); *United States v. Conservation Chem. Co.,* 653 F.Supp. 152, 200 (W.D.Mo.1986); *SCSC Corp. v. Allied Mut. Ins. Co.,* 515 N.W.2d 588, 599 (Minn.Ct.App. 1994); *New Jersey v. Signo Trading Int'l, Inc.,* 130 N.J. 51, 612 A.2d 932, 939 (1992). The purpose of the exclusion is to effectuate the intent that "[l]iability insurance is designed to provide compensation for damages to property not owned or controlled by the insured." *Travelers Ins. Co. v. Waltham Indus. Labs. Corp.,* 722 F.Supp. at 829. Therefore, even if the property damage had been incurred while the Insured owned the property, coverage for the damage is still specifically excluded under the policies.

█ The Insured contends, however, that the pollutants on the Site have contaminated the groundwater within the property, and that groundwater is not property "owned or occupied by or rented to the insured." Yet, under Texas law, underground water "percolating, oozing, or filtrating through the earth" is owned by the surface owner. TEX.WATER CODE ANN. § 52.002 (Vernon 1994); *Friendswood Dev. Co. v. Smith–Southwest Indus., Inc.,* 576 S.W.2d 21, 25, 29, 30 (Tex.1978); *Houston v. T.C. Ry. v. East,* 98 Tex. 146, 81 S.W. 279, 280 (1904). Neither the OKR complaint nor the FDIC complaint alleged contamination beyond the underground water on the Site. In fact, although the FDIC argued that an injunction was necessary to prevent contamination from entering third-party property or a nearby aquifer, it admitted that "water wells near the property have been tested and do not show detectable levels of trichloroethane or 1,1,1–trichloroethane at this time." Therefore, coverage under the insurance policies is barred by the owned property exclusion because the property damage alleged in the underlying petitions was specifically limited to contamination on the Site.

### c. *Third-Party Property Damage.*

█ The owned and alienated property exclusions do not apply when property owned by a third party is allegedly damaged. *Figgie Int'l, Inc. v. Bailey,* 25 F.3d at 1270; *Taylor–Morley–Simon, Inc. v. Michigan Mut. Ins. Co.,* 645 F.Supp. at 600; *New Jersey v. Signo Trading Int'l, Inc.,* 612 A.2d at 939. The Insured argues that the Insurers had a duty to defend them in the OKR suit and the FDIC suit because the complaints in both of these actions alleged damage to third-party property. A review of the complaints demonstrates, however, that they contain no allegations regarding damage to property owned by third parties. OKR sought to recover damages for diminution in the property value of the Site, future clean-up costs on the Site, and loss of future profits. As discussed above, the FDIC admitted that it was not aware of any damage to property owned by third parties. Thus, the two underlying suits limit their demand for recovery to property damage arising from contamination of the Site itself. Accordingly, the Insurers had no obligation to defend USI and Wyatt with regard to third-party property damage.

### 2. *The Pollution Exclusion.*

INA's, Travelers', and AMICO's insurance policies also preclude coverage for "bodily injury or property damage arising out of the discharge, dispersal, release or escape of ... acids, alkalies, toxic chemicals, liquids or gases, or waste materials or other irrigants, contaminants, or pollutants into or upon land, the atmosphere or any water course or body of water." This exclusionary clause generally invalidates insurance coverage for property damage resulting from the discharge of pollutants or contaminants, but contains an exception which restores any potential cover-

age in the event that the discharge is both "sudden and accidental." *Meridian Oil Prod., Inc. v. Hartford Accident & Indem. Co.,* Mealey's Litigation Reports: Insurance, Vol. 7, Iss. 21, 3, § B (Apr. 6, 1993), *aff'd,* 27 F.3d 150 (5th Cir.1994); *In re Texas E. Transmission Corp.,* MDL No. 764, 1992 WL 227847, at *52 (E.D.Pa. July 10, 1992), *aff'd,* 995 F.2d 219 (3rd Cir.1993), *aff'd,* 15 F.3d 1230 (3rd Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 291, 130 L.Ed.2d 206 (1994) (interpreting Texas law); *National Standard Ins. Co. v. Continental Ins. Co.,* No. CA–3–81–1015–D, slip op. at 8 (N.D.Tex. Oct. 4, 1983). INA, Travelers, and AMICO argue that they were not obligated to defend USI or Wyatt in the underlying cases because the property damage alleged resulted from the discharge of pollutants or contaminants on the property over a period of sixteen years beginning in 1962 through 1978. The Insured, however, asserts that the pollution exclusionary clauses do not apply because the contamination on the Site was sudden and accidental, thereby invoking the exception to the clause.

 While the Texas Supreme Court has not addressed the interpretation of the pollution exclusion clause, several federal courts have expressed their opinions concerning what the Texas Supreme Court would hold if presented the question. *See Meridian Oil Prod., Inc. v. Hartford Accident & Indem. Co.,* Mealey's Litigation Reports: Insurance, Vol. 7, Iss. 21, at 3. In those cases, the courts have determined that the "sudden and accidental" exception to the pollution exclusionary clause is clear and unambiguous. *Mustang Tractor & Equip. v. Liberty Mut. Ins. Co.,* No. H–91–2523, 1993 WL 566032, at *11 (S.D.Tex. Oct. 8, 1993); *Meridian Oil Prod., Inc. v. Hartford Accident & Indem. Co.,* Mealey's Litigation Reports: Insurance, Vol. 7, Iss. 21, at 3; *In re Texas E. Transmission Corp.,* MDL No. 764, 1992 WL 227847, at *55. The initial discharge, not the resulting damage or pollution, must be sudden and accidental in order to avoid the pollution exclusion clause of the policy. *Meridian Oil Prod., Inc. v. Hartford Accident & Indem. Co.,* Mealey's Litigation Reports: Insurance, Vol. 7, Iss. 21, at 3; *In re Texas E. Transmission Corp.,* MDL No. 764, 1992 WL 227847, at *55. Moreover, the courts have opened that the term "sudden" has a temporal meaning of "quick" or "abrupt," not "unexpected" or "unintended," as argued by the Insured. *Mustang Tractor & Equip. v. Liberty Mut. Ins. Co.,* No. H–91–2523, 1993 WL 566032, at *11; *Meridian Oil Prod., Inc. v. Hartford Accident & Indem. Co.,* Mealey's Litigation Reports: Insurance, Vol. 7, Iss. 21, at 4; *In re Texas E. Transmission Corp.,* MDL No. 764, 1992 WL 227847, at *55; *see also Northern Ins. Co. v. Aardvark Assoc.,* 942 F.2d 189, 192 (3d Cir.1991); *United States Fidelity & Guar. Co. v. Star Fire Coals, Inc.,* 856 F.2d 31, 34–35 (6th Cir.1988). In fact, one court reasoned:

> [t]he very use of the words "sudden and accidental" reveal a clear intent to define the words differently, stating two separate requirements. Reading "sudden" in its context, i.e. joined by the word "and" to the word "accident", (sic) the inescapable conclusion is that "sudden" even if including the concept of unexpectedness, also adds an additional element because "unexpectedness" is already expressed by "accident." This additional element is the temporal meaning of sudden, i.e. abruptness or brevity. To define sudden as meaning only unexpected or unintended, and therefore as a mere restatement of accidental, would render the suddenness requirement mere surplusage.

*Mustang Tractor & Equip. v. Liberty Mut. Ins. Co.,* No. H–91–2523, 1993 WL 566032, at *11 (citing *Northern Ins. Co. v. Aardvark Assoc.,* 942 F.2d at 192); *see also United States Fidelity & Guar. Co. v. Star Fire Coals, Inc.,* 856 F.2d at 34–35.

 In applying the pollution exclusionary clause, the *Meridian* court held that the discharge of pollutants into reserve pits over a period of thirteen months did not fulfill the temporal requirements for "sudden." *Meridian Oil Prod., Inc. v. Hartford Accident & Indem. Co.,* Mealey's Litigation Reports: Insurance, Vol. 7, Iss. 21, at 4. Moreover, in *National Standard,* the court held that, under Texas law, discharges of pollutants over "a period of years" could not be considered " 'sudden and accidental.' " *National Stan-*

dard Ins. Co. v. Continental Ins. Co., No CA-3-81-1015-D, slip op. at 8. This court similarly finds that Wyatt's and USI's discharge of contaminants on the Site from 1962 until 1978, a period of sixteen years, was not "sudden" within the plain meaning of the term.

■ Furthermore, the FDIC petition accused Wyatt and USI of dumping degreasing chemicals and sludge from the degreasing operation on the ground outside of the manufacturing building on the Site and storing degreasing chemicals and formic acid/methylene chloride mixture in drums and tanks which allowed leakage and spillage onto the ground outside of the manufacturing building. The OKR petition also alleged that Wyatt and USI improperly disposed of hazardous chemical wastes on the Site. Allegations, such as those made by OKR and the FDIC, regarding the intentional dumping or disposing of hazardous wastes on the Site cannot be defined as "accidental," despite a lack of knowledge of the substance's pollutant content. Meridian Oil Prod., Inc. v. Hartford Accident & Indem. Co., 27 F.3d at 152; In re Texas E. Transmission Corp., MDL No. 764, 1992 WL 227847, at *56. Moreover, courts have been unwilling to reject the applicability of the pollution exclusionary clause where a policyholder engages in the deliberate discharge of contaminants in the routine course of business, even though the policyholder may have experienced isolated spills or minor accidents occurring over the course of many years. See generally Meridian Oil Prod., Inc. v. Hartford Accident & Indem. Co, 27 F.3d at 152; Lumbermens Mut. Casualty Co. v. Belleville Indus., Inc., 938 F.2d 1423, 1427 (1st Cir. 1991), cert. denied, 502 U.S. 1073, 112 S.Ct. 969, 117 L.Ed.2d 134 (1992); Johnson & Co. v. Aetna Casualty & Sur. Co., 741 F.Supp. 298, 304 (Mass.1990), aff'd, 933 F.2d 66 (1st Cir.1991). Thus, even if the contamination of the Site were found to be "sudden," the pollution exclusionary clause precludes recovery by the policyholder because it could not also be classified as "accidental." Accordingly, due to the pollution exclusionary clauses contained in their policies, INA, Travelers, and AMICO are entitled to summary judgment with respect to their obligation to defend Wyatt and USI against claims for property damage in the underlying suits.

### 3. Bodily Injury.

The fifteen insurance policies at issue provide general liability coverage for bodily injury. In the OKR suit, Kenny sought to recover for mental anguish and emotional distress suffered as a result of business and financial reverses and threats to his health through exposure to contamination. Kenny did not allege that he suffered any physical injuries. The Insurers argue that the bodily injury provision in their policies is limited to coverage for physical injuries and assert that they had no obligation to defend against Kenny's claim of emotional distress.

■ The policies generally define the term "bodily injury" as "bodily injury, sickness or disease sustained by any person." The United States Court of Appeals for the Fifth Circuit has concluded that, under Texas Law, the phrase "bodily injury" unambiguously excludes "nonphysical injuries" such as emotional anguish, emotional trauma, or severe emotional distress. Travelers Indem. Co. v. Holloway, 17 F.3d 113, 115 (5th Cir. 1994). The Insured argues, however, that this court cannot rely on Holloway because the Holloway court limited its decision to the facts alleged in that case. In Holloway, Travelers Insurance Company brought a declaratory judgment action in federal court seeking a declaration that it did not have a duty to defend its policyholder in an action filed in state court alleging severe emotional distress. The bodily injury provision in the Holloway policy is virtually identical to that of the insurance policy issued by Travelers and the other insurance companies in the instant case. Therefore, this court is bound by the Court of Appeals' interpretation of the phrase "bodily injury" as excluding nonphysical injuries, such as those alleged by Kenny. Broussard v. Southern Pac. Transp. Co., 665 F.2d 1387, 1389 (5th Cir.1982); see also McClane v. Sun Oil Co., 634 F.2d 855, 858 (5th Cir.1981).

In addition, the Fifth Circuit considered case law from other jurisdictions before reaching its conclusion concerning the defini-

tion of "bodily injury." In *Holloway*, the court notes that its holding "comports with the overwhelming weight of authority from other states." *Travelers Indem. Co. v. Holloway*, 17 F.3d at 115 (citing *National Casualty Co. v. Great Southwest Fire Ins. Co.*, 833 P.2d 741, 746 (Colo.1992)); *see also United Pac. Ins. Co. v. First Interstate Bancsystems*, 690 F.Supp. 917, 918 (D.Mont.1988); *West Am. Ins. Co. v. Bank of Isle of Wight*, 673 F.Supp. 760, 765 (E.D.Va.1987); *Continental Casualty Co. v. Synalloy Corp.*, 667 F.Supp. 1550, 1559 (S.D.Ga.1985), *aff'd*, 826 F.2d 1024 (11th Cir.1987); *American & Foreign Ins. Co. v. Church Sch. in the Diocese*, 645 F.Supp. 628, 632 (E.D.Va.1986); *Rolette County v. Western Casualty & Sur. Co.*, 452 F.Supp. 125, 130 (D.N.D.1978); *Allstate Ins. Co. v. Diamant*, 401 Mass. 654, 518 N.E.2d 1154, 1156 (1988); *Presidential Hotel v. Canal Ins. Co.*, 188 Ga.App. 609, 373 S.E.2d 671, 672 (1988); *E–Z Loader Boat Trailers, Inc. v. Travelers Indem. Co.*, 106 Wash.2d 901, 726 P.2d 439, 443 (1986). The Court of Appeals clearly had access to the cases cited by the Insured in support of the position that emotional distress constitutes bodily injury, but declined to follow them. *See generally National Casualty Co. v. Great Southwest Fire Ins. Co.*, 833 P.2d at 746 (citing *Morrison Assur. Co. v. North Am. Reinsurance Corp.*, 588 F.Supp. 1324, 1327 (N.D.Ala.1984), *aff'd*, 760 F.2d 279 (11th Cir.1985); *Loewenthal v. Sec. Ins. Co.*, 50 Md.App. 112, 436 A.2d 493, 499 (1981)). Therefore, in accordance with established precedent, this court concludes that the Insurers were not obligated to defend against Kenny's claim of emotional distress.

### 4. Late Notice.

Finally, the insurance policies contain a provision prohibiting coverage if the policyholder fails to give the insurer notice of an "occurrence" or a lawsuit pending against the policyholder "promptly, immediately, or as soon as practical." Under Texas law, the phrases "as soon as practicable" or "immediately" have been interpreted to require "only that notice be given within a reasonable time in light of the circumstances involved." *Continental Sav. Ass'n v. United States Fidelity & Guar. Co.*, 762 F.2d 1239, 1243 (5th Cir. 1985); *McPherson v. St. Paul Fire & Marine Ins. Co.*, 350 F.2d 563, 566 (5th Cir. 1965); *Employers Casualty Co. v. Scott Elec. Co.*, 513 S.W.2d 642, 645 (Tex.Civ.App.—Corpus Christi 1974, no writ); *Central Sur. & Ins. Corp. v. Anderson*, 446 S.W.2d 897, 902 (Tex.Civ.App.—Fort Worth 1969, no writ); *Pioneer Casualty Co. v. Blackwell*, 383 S.W.2d 216, 219 (Tex.Civ.App.—Waco 1964, writ ref'd n.r.e.). The purpose of the notice requirement is to "enable the insurer to promptly investigate the circumstances of an accident so that it can prepare to defend any claim that may arise." *In re Texas E. Transmission Corp.*, MDL No. 764, 1992 WL 227847, at *66 (quoting *Stonewall Ins. Co. v. Modern Exploration, Inc.*, 757 S.W.2d 432, 435 (Tex.App.—Dallas 1988, no writ)).

A failure to give timely notice is a breach of the insurance contract and relieves the insurer of its obligation to defend or indemnify. *McPherson v. St. Paul Fire & Marine Ins. Co.*, 350 F.2d at 566; *see generally Chiles v. Chubb Lloyds Ins. Co.*, 858 S.W.2d 633, 634 (Tex.App.—Houston [1st Dist.] 1993, writ denied); *Members Ins. Co. v. Branscum*, 803 S.W.2d 462, 467 (Tex. App.—Dallas 1991, writ denied); *Employers Casualty Co. v. Mireles*, 520 S.W.2d 516, 518 (Tex.Civ.App.—San Antonio 1975, writ ref'd n.r.e.); *Employers Casualty Co. v. Scott Elec. Co.*, 513 S.W.2d at 645; *Members Mut. Ins. Co. v. Cutaia*, 476 S.W.2d 278, 278 (Tex. 1972); *see generally Klein v. Century Lloyds*, 154 Tex. 160, 275 S.W.2d 95, 96–97 (1955). The reasonableness of a delay in notification, while generally a question of fact, becomes a question of law if the facts are undisputed. *Continental Sav. Ass'n. v. United States Fidelity & Guar. Co.*, 762 F.2d at 1243; *McPherson v. St. Paul Fire & Marine Ins. Co.*, 350 F.2d at 566; *Klein v. Century Lloyds*, 275 S.W.2d at 97.

Effective May 1, 1973, by way of an amendatory endorsement applicable to all general liability policies issued or delivered in Texas, an insurer must prove that it is prejudiced by the insured's failure to forward suit papers before such a failure will bar liability under the policy. *In re Texas E. Transmission Corp.*, MDL No. 764, 1992 WL

227847, at \*65; *Chiles v. Chubb Lloyds Ins. Co.*, 858 S.W.2d at 635 and n. 2; *Members Ins. Co. v. Branscum*, 803 S.W.2d at 467; *Trevino v. Allstate Ins. Co.*, 651 S.W.2d 8, 11 n. 1 (Tex.App.—Dallas 1983, writ ref'd n.r.e.); *Shelton v. Ray*, 570 S.W.2d 419, 420 (Tex.Civ. App.—El Paso 1978, no writ); State Bd. of Ins., Revision of Texas Standard Provision For General Liability Policies—Amendatory Endorsement—Notice, Order No. 23080 (March 13, 1973). An insurer is prejudiced by the insured's failure to forward suit papers when there is evidence of change in position adverse to the carrier's interest. *In re Texas E. Transmission Corp.*, 15 F.3d at 1255; *Members Ins. Co. v. Branscum*, 803 S.W.2d at 466; *Kimble v. Aetna Casualty & Sur. Co.*, 767 S.W.2d 846, 850–51 (Tex.App.—Amarillo 1989, writ denied).

The Insurers in this action contend that USI and Wyatt were not entitled to coverage in the underlying suits because they failed to provide notice of the lawsuits within a reasonable time. While the Insured admits that the first Insurer was not notified of the pending lawsuits until April 1989, some fourteen months after the initial filing of the OKR petition, the Insured contends that notice was reasonable under the circumstances. In support, the Insured offers evidence that the delay in notifying the Insurers was due to the loss of the policies through the several mergers between Wyatt, USI, and Hanson.

The Insured also asserts that coverage should not be denied because the Insurers have not proven that they were prejudiced by the delay. Yet, American States issued policies to Wyatt and USI between January 1, 1960, and April 1, 1971. Thus, American States' policies were issued prior to the amendatory endorsement, and a showing of prejudice is not required to bar liability under the policy. Likewise, Travelers insured USI from April 1, 1971, to April 1, 1972. Thus, Travelers is not required to show prejudice in order to bar recovery under its policy. Finally, INA insured USI between April 1, 1972, and April 1, 1976. The amendatory endorsement became effective on May 1, 1973, during the middle of the second insurance policy issued by INA. Therefore, INA is not required to show prejudice as to its first insurance policy, which was issued for the period April 1, 1972, to April 1, 1973.

Moreover, INA is located in Philadelphia, Pennsylvania, and it issued both of its policies to USI in New York City through Alexander & Alexander, Inc., a New York insurance agent. Because INA did not issue or deliver the policies in Texas, it also would not be required to show prejudice in order to bar coverage for late notification on any of its policies, including the policies issued between April 1, 1973, and April 1, 1976.

Similarly, AMICO's home office is located in Long Grove, Illinois. AMICO issued seven policies to USI at USI's New York City address. All seven of these policies were signed in New York City. Therefore, AMICO did not issue or deliver policies in Texas and would not have to demonstrate prejudice in order to bar recovery for late notification.

Determinations of untimely notice have ranged from a thirty-two day delay to a two year and four month delay following an occurrence. For example, in *Klein,* the policy required notice "as soon as practicable," and the Texas Supreme Court held that notice given thirty-two days after the accident was, as a matter of law, not given as soon as practicable. *Klein v. Century Lloyds,* 275 S.W.2d at 97. In *McPherson,* the Fifth Circuit held that a fifty-four day delay by the insured in notifying insurers of a pending suit relieved the insurers of their obligation to defend or indemnify. *McPherson v. St. Paul Fire & Marine Ins. Co.,* 350 F.2d at 567. Finally, in *Yorkshire Indem. Co.,* the Fifth Circuit held that a delay in notification of a pending lawsuit for over two years prohibited recovery under a general liability insurance policy. *Yorkshire Indem. Co. of N.Y. v. Roosth & Genecov Prod. Co.,* 252 F.2d 650, 653, 657 (5th Cir.1958). These cases further recognize the principle that notice "as soon as practicable" means "notice within a reasonable time, and what is a reasonable time depends upon the facts and circumstances in each particular case." *Continental Sav. Ass'n v. United States Fidelity & Guar. Co.,* 762 F.2d at 1243; *McPherson v. St. Paul Fire & Marine Ins. Co.,* 350 F.2d at 566–67; *Employers Casualty Company v.*

Scott Elec. Co., 513 S.W.2d at 645; *Klein v. Century Lloyds Ins. Co.,* 275 S.W.2d at 97.

■ In the instant case, the Insured waited a minimum of fourteen months before notifying any Insurer of the pending lawsuits. While it is understandable that insurance policies dating back almost thirty years may be misplaced during two different mergers between companies, delaying notification of a pending lawsuit by fourteen months is not reasonable under these manpower and initiative. The policies should have been located and the Insurers notified within a few months. Hence, the Insurers are entitled to summary judgment on the issue of late notice.

III. *Conclusion.*

The Insurers had no duty to defend the Insured in the underlying suits due to untimely notification by the Insured. Moreover, even if notification had been timely, the Insurers were not obligated to defend the Insured against claims for property damage or bodily injury because such claims were barred through the owned property/alienated property exclusions, pollution exclusions, and bodily injury requirements in the respective policies. Having determined that the Insurers are entitled to summary judgment on a number of bases, this court need not address the remaining arguments.

Accordingly, the motions for partial summary judgment of American States, INA, Travelers, and AMICO are GRANTED.

The cross-motion for summary judgment of Wyatt and USI is DENIED.

IT IS SO ORDERED.